**In the Matter of LAS COLINAS, INC. and Eastern Shore Development Corporation, Debtors.**

**No. B–38–64.**

United States District Court
D. Puerto Rico.

Dec. 4, 1968.

Bill Brice, from Geary, Brice & Lewis, Dallas, Tex., for Debtors.

Baragaño, Trias, Saldaña & Francis, San Juan, P. R., for Banco Popular de Puerto Rico.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CANCIO, Chief Judge.

On October 15, 1964, Las Colinas, Inc., and Eastern Shore Development Corporation filed a petition proposing an arrangement with their creditors under the provisions of Chapter XI of the Bankruptcy Act. After several hearings and incidents, Debtors and one of the creditors, a bank known as Banco Popular de Puerto Rico, signed a stipulation on September 19, 1967, wherein it was agreed by both parties that this Court had jurisdiction over all the parties and all matters involved in these proceedings, and that forclosure proceedings pending in the Superior Court of Puerto Rico, Humacao Part, should be permanently enjoined and the proceedings terminated. It was also agreed and stipulated that this Court should render a judgment on the merits on all disputes and controversies between Debtors and Banco Popular de Puerto Rico. The above mentioned stipulation was approved by this Court on October 4, 1967.

The final hearings in these proceedings were held on the 25th, 26th, 27th and 28th of March and continued during the week beginning on the 1st of April, and were concluded on April 8, 1968. On April 8, 1968, this Court ordered the parties to file proposed findings of fact and conclusions of law. They have done so.

### FINDINGS OF FACT

On or about September of 1961, Vigdor Schreibman, President of Arenas, Inc., submitted to Abner Kalisch, Vice-President of Banco Popular, a proposal requesting the financial backing of said banking institution for the development of land in the Municipality of Luquillo, Puerto Rico. The development would comprise several parcels of land bought by Arenas, Inc., and other corporation, Las Colinas, Inc., during the years 1961 and 1962. Mr. Vigdor Schreibman was the President of both corporations as well as the principal stockholder, since

he owned more than 52% of all the stock issued by both. There is no doubt that in the early negotiations, the only persons who participated were Mr. Vigdor Schreibman, representing the developing corporations, and Mr. Abner Kalisch, representing Banco Popular de Puerto Rico. There is no written document with respect to the early conversations between Mr. Schreibman and Mr. Kalisch.

The nature of Arenas' request was that said corporation and other subsidiaries were planning a residential and recreational development to be known as "Las Colinas Development." These corporations were requesting the interim financing of the development. At first, the Bank informed Mr. Schreibman that it was interested in providing financial assistance by stages if certain conditions were met.

Considering the documentary and oral evidence as a whole there is no doubt that Banco Popular initially agreed to finance the development of a 50-cuerda tract into 125 lots and that it later agreed to finance the construction of 46 houses that were already sold. The granting of further financial assistance for the development of the project and for the construction of more houses, buildings and facilities was conditioned on the outcome of the First Section of the Development.

In order to obtain the financial assistance for the development of the First Section, Arenas, Inc., the predecessor of Las Colinas, Inc., submitted to the Bank certain plans, blueprints, budgets, cost estimates and projections as to the time it would take to finish the work for the development of the land, sale of lots without houses and the amount of money Arenas, Inc., was to receive from the sale of said lots. On the basis of this information, Banco Popular approved a line of credit for the development of the land in the amount of $482,000.00. It was agreed that the advances to be made under this line of credit would pay interest at a rate of 6½% per annum and that Arenas, Inc., was to pay Banco Popular a commission equivalent to 1% of the total amount of each advance payment received.

The original line of credit approved by Banco Popular in the amount of $482,-000.00 was not intended solely for the development of land or site improvement. The Court is aware that on several occasions during the period of time this line of credit was in effect, Arenas, Inc., requested certain sums of money for purposes other than "site improvement." There is no evidence that Banco Popular intended to grant or did grant a credit for these additional expenses. On the contrary, there is evidence that the Bank repeatedly told the officers of Arenas, Inc., and later of Las Colinas, Inc., that said corporation had to raise more working capital, necessary for administrative expenses and general overhead. On the basis of what has been stated above, we have to conclude that under the original line of credit of $482,000.00, the Bank advanced money to Arenas, Inc., that was not intended to pay the cost of developing the land. This conclusion is further strengthened by the fact that although a line of credit was approved in the amount of $482,000.00, the cost of developing the land in the First Section was estimated at approximately $318,000.00, on the basis of the then existing construction contract between Arenas, Inc., and the General Contractors, Alpha-Burke Wilhelm.

There is no room for doubt that Banco Popular granted the credits for the development of land as well as for the construction of houses, considering that the source of payment would be the sale of the lots and the sale of the lots and houses. This Court has before it a memorandum prepared by the Bank for the guidance of the Bank's officials and of the Bank's Credit Committee, that unequivocally establishes this fact. Besides, the financial situation of Arenas, Inc., Las Colinas, Inc., and Eastern Shore Development Corporation, the last two corporations assisting the first in the development of the project, strengthens this conclusion. Arenas, Inc., and Las Colinas, Inc., had purchased approximately 700 cuerdas of land for the whole proj-

ect at an approximate cost of $700,000.00. Said corporations paid only around $220,-000.00 in cash of the total purchase price of the land bought, owing the balance. The total capital of these corporations was about $436,000.00 in investments in capital obligations and $3,000.00 as paid in capital.

Debtors' assertion that the credit facilities granted were to be paid with the proceeds of the sales of the lots and of the lots and houses, regardless of the period of time Arenas, Inc., would take to finish the works of development of land, of house construction and sale of same, is quite improbable, since it is contrary to business sense and to common sense. Considering all the evidence submitted, there is room for only one conclusion: Banco Popular granted a line of credit for the development of land in the First Section of the project and later granted another line of credit for the construction of houses. We also have to conclude that in granting said lines of credit it was considered that the sale of lots and lots with houses was to be the source of payment and that said payment or payments were to be expected within the projections submitted or at least within a reasonable period of time after the projected time for the completion of the development of land and house construction.

The first line of credit was approved by Banco Popular on September 19, 1961. According to the projections submitted by Arenas, Inc. to Banco Popular, and according to the frequent conversations between the officials of both parties, it was expected that the works on the development of land were to be completed in six (6) months after breaking ground. Regarding this aspect, there is no doubt that the works were not carried out as scheduled. On the contrary, there was some delay and the works on the land development or site improvement did not start until April 1962.

On September 18, 1962, and before the land development was completed, Banco Popular granted an additional line of credit to Arenas, Inc., this time in the amount of $500,000.00, for the construction of forty-six (46) houses. This line of credit was granted under the same conditions as the prior line of credit, except that the rate of interest was reduced to 6%. The payment of the amounts advanced under this line of credit was to be made from the proceeds of the sales of lots and houses in the First Section of the project. The time of payment is again in controversy, but there is no doubt that the parties projected that the houses were to be completed within a period of approximately six (6) months, or by February or March, 1963. Neither the site improvement nor the construction of houses was completed within the projected period of time. As a matter of fact, it was never completed. The evidence as a whole establishes that Arenas, Inc., had difficulties with the contractors since the beginning; that these difficulties, plus delays in the works already started, as well as the fact that Arenas, Inc., spent part of the sums advanced for plans, surveys and studies for the development of another fifty cuerdas tract that comprised Section Two of the project, resulted in the inability to complete the work on time and in insufficient funds with which to finance the completion of the work. The delays also increased the costs, and these facts prevented completion of the land improvement and of the construction of houses according to the cost estimates and projections originally accepted and referred to above.

Debtors tried to establish that there was no agreement as to the time within which the development of the land and the construction of houses was to be completed. They also asserted that the advances made under the lines of credit were not to be paid until the lots or houses were sold. Despite the fact that the projections submitted to Banco Popular were part of the transaction and were made to induce said banking institution to grant the lines of credit, and that said projections were considered by the Bank to determine the cost of the works to be undertaken in Section One and the selling

price of the lots and houses, they also refute the assertion that the Bank had agreed to readjust the financial commitments according to preliminary or additional budgets to be submitted by Debtors. Said assertion flies in the face of common sense since it is most improbable that a bank or any other financial institution would undertake to make a loan without establishing when, how, and from what sources the loan is to be paid back. The most rational and equitable conclusion that can be reached from the voluminous evidence before us is that the two lines of credit granted in the amounts of $482,000.00 and $500,000.00, as well as the advances made later in excess of these two lines of credit, represented a total amount which the parties felt was sufficient to complete the works as proposed and that any amount loaned was to be paid from the proceeds of the sale of lots and houses immediately after completion of the works. We cannot conclude that a period of time was not fixed for the completion of site improvement and house construction. On the contrary, the six-month period seems to be the period of time agreed upon, considering the kind of work involved and the testimony of the Bank's officials in these proceedings.

Neither land improvement of the First Section nor the construction of houses was completed by February or March, 1963. Nevertheless, on June 18, 1963, Banco Popular increased the line of credit up to $1,750,000.00. This increase was made to provide Arenas, Inc., with sufficient funds to finish the works of the development of land and the construction of 46 houses. The parties agreed that the rate of interest was to be 6% on the loans for house construction and 6½% on the loans for development of land or site improvement. The Court has no evidence as to the extension of time to complete the works.

Although, as we stated before, the line of credit was increased so that the developers could finish the works of the development of land in the First Section and the construction of 46 houses, it is an undisputed fact that the developers had undertaken the construction of more than 46 houses. This is established by the construction contract signed by the developers (Arenas, Inc.) and the contractors (Rodríguez & Del Valle, Inc.,) on February 1, 1963. By February 18, 1963, Arenas, Inc. was in the process of constructing more than 46 houses. We are convinced that Banco Popular acquired knowledge of this fact and that it consented to, even if not willingly, the construction of more than 46 houses. There is the testimony of a Bank official to the effect that the amount of $1,400.00 was approved for each house in excess of the 46 that were under construction. The same official authorized loans for the partial payment of a mortgage which encumbered part of the land on which these additional houses were being constructed and for the payment of other debts and obligations of Arenas, Inc. From all the above, it is reasonable to infer that when in June 18, 1963 Banco Popular increased the line of credit to $1,750,000.00, the parties took these additional costs in consideration in fixing a new maximum line of credit. However, there is evidence to convince the Court that not only Las Colinas, Inc., but also Rodríguez & Del Valle, Inc., knew that Banco Popular would not advance the necessary funds to cover the entire cost of construction of the additional houses and that the contractors would have to wait until the additional houses were sold to obtain payment of the full cost of construction.

Considering the evidence as a whole, we are convinced that Banco Popular never increased or approved lines of credit to Arenas, Inc. for more than $1,750,000.00. Once this credit was exhausted, or was almost exhausted, and all the interest paid up to November 25, 1963, Banco Popular refused to approve and to pay a new requisition submitted by Arenas, Inc., for approximately $26,000.00. This amount was requested in order to pay the payroll for the month of November 1963. It was not until December 27, 1963, and after some meetings with Mr. Vigdor Schreibman, President of

Arenas, Inc., that Banco Popular authorized the payment of this requisition and that the amount thereof was credited to the account of Arenas, Inc. It was at this time that Banco Popular received as pledgee and as collateral security to all debts a bearer mortgage note in the amount of $2,000,000.00

We also have to conclude that the line of credit approved in the amount of $1,750,000.00 was not of a revolving character. The evidence before this Court convinces us that Banco Popular only committed itself to grant credit up to the amount mentioned above, and that it was willing to undertake the financing of additional work depending on the outcome of the work in process on the First Section of the Las Colinas Project. The Court is not convinced that a banking institution would commit itself to finance a multimillion dollar project without waiting to find out how the first stages of the project are carried out. We are convinced that Banco Popular may have expressed its willingness to finance the whole project depending on the results achieved upon completion of the First Section and after the lots and houses in that section had been sold. The additional loans that were granted—one in the approximate amount of $26,000.00 and the other to pay the notarial fees and other expenses of the $2,000,000.00 mortgage and its recordation in the Registry of Property—were considered and granted separately while new negotiations and conversations were being held between the Bank and Debtors for additional credit. These negotiations proved fruitless, as the Bank refused to lend additional funds.

We have already stated that when the line of credit was increased to $1,750,000.00, the parties did not agree on an additional period of time for completion of the works in Section One or for the payment of the debt. It would be absurd to conclude that when on June 18, 1963 Banco Popular granted the additional credit requested to finish the land development on the First Section and the construction of houses in that section, it did not take into consideration the fact that the completion of said work was to take some time. There is no conclusive evidence as to the existence of an express agreement regarding the time the parties thought would be required to finish the works already started. However, if the line of credit was increased to the sum of $1,750,000.00 in order to provide for the completion of the Section One works, then these works should have been completed during December 1963, when the credit was almost totally exhausted. Instead, we find that: (1) The houses were far from finished and the other work was still not completed. (2) The credit became exhausted and there were no other resources with which to finance the completion of these works. Therefore, in the absence of conclusive evidence to the effect that the loans were to be payable at a later date, we must conclude that at the time this situation arose, Banco Popular was entitled to demand payment of all the sums owed to it.

The debt is evidenced by eighty-three notes that altogether add up to the sum of $1,776,532.63. All notes are payable on demand, to the order of Banco Popular de Puerto Rico, which is the owner and holder of said notes. Although from the face of all notes it is sometimes impossible to determine the rate of interest agreed for each one, there was sufficient evidence presented to the Court to clearly establish that, as to the first credit of $482,000.00, the rate of interest agreed upon was 6½%. There was contradictory evidence as to the rate of interest agreed upon for the balance of the amount loaned, which forces us to conclude that the balance of the loan up to $1,776,532.63 should earn interest at a rate of 6% per annum, which was the lower rate agreed upon.

Interest accrued until December 27, 1963 was totally paid, which means that Debtors owe to Banco Popular the principal sum of $1,776,532.63, with interest at 6½% per annum on the first $482,000.00 from December 28, 1963, and interest at 6% per annum on the differ-

ence from the same date. According to the text of each note, Debtors agreed to pay the expenses, costs and attorneys' fees in case foreclosure proceedings were necessary to collect the amount owed, in the amount of 10% of the principal sum of each note. In other words, besides the principal and interests owed, Debtors owe to Banco Popular de Puerto Rico the sum of $177,653.26 for costs, expenses and attorneys' fees.

The whole debt, including principal, interests, costs, expenses and attorneys' fees, was secured by three (3) bearer mortgage notes that were delivered to Banco Popular as collateral security or pledge. The first mortgage note, hereinafter called "First Arena Mortgage Note", is in the principal amount of $500,000.00 and was issued by Arenas, Inc. on April 26, 1962. This mortgage note is payable to the bearer on demand with interest at 6½% per annum. It is secured by a mortgage constituted by Deed Number 53, executed on April 26, 1962, before Notary Rafael Baragafio Diez. The second mortgage note, hereinafter called "Second Arenas Mortgage Note," was issued by Arenas, Inc. on February 5, 1963, and is payable to the bearer on demand. This second note is in the principal amount of $500,000.00, with interest at 6% per annum, and is secured by a mortgage constituted by Deed Number 26, executed on February 5, 1963 before Notary Edilberto Berríos Dávila. The third note, in the principal amount of $2,000,000.00 with interest thereon at the rate of 6% per annum, was issued by Las Colinas, Inc. on December 20, 1963. This third mortgage note was signed by Vigdor Schreibman as President of Las Colinas, Inc., and is secured by a mortgage constituted by Deed Number 374, executed on December 1963, before Notary Edilberto Berríos Dávila.

The mortgages encumber two parcels of one hundred (100) cuerdas each, located in the Demajagua Ward of the Municipality of Fajardo, Puerto Rico. Both parcels were free of liens or encumbrances and the development of land and the construction of houses were taking place in one of them. The remaining land which we have referred to was subject to mortgages securing the purchase price owed, which totalled around $480,000.00.

On April 26, 1962, the same date the first mortgage was executed, Arenas, Inc. executed and delivered to Banco Popular a general pledge agreement in favor of the Bank. This document was signed and executed before a notary public by Joseph K. Summers, as Vice President of Arenas, Inc. According to this document, all securities already delivered or to be delivered in the future to Banco Popular would constitute security for the payment of debts and obligations already contracted or to be contracted in the future by the debtor with Banco Popular de Puerto Rico. The Bank was entitled, by means of this document, to request from the debtor (Arenas, Inc.) the delivery of additional security to secure the payment of existing obligations. The document also states that if additional security is requested and not delivered, the creditor (Banco Popular) is entitled to request the full payment of all debts and obligations, regardless of the time agreed upon for payment.

There is no real controversy between the parties as to the validity of the mortgages created on April 26, 1962 and February, 5, 1963. These two mortgages were duly recorded in the Registry of Property and were validly issued and delivered to Banco Popular, to secure the loans that were to be granted and those already granted to Arenas, Inc. The real controversy involves the $2,000,000.-00 mortgage note executed on December 20, 1963. This obligation was signed or issued by Vigdor Schreibman as President of Las Colinas, Inc., which was the surviving corporation in the merger of Las Colinas, Inc., Arenas, Inc., Ceiba Corporation and Eastern Construction Corporation. The mortgage which secured the payment of the $2,000,000.00 note was executed by Mr. Vigdor Schreibmen, as President of Las Colinas, Inc. According to the certificates of

resolutions approved by the Boards of Directors of Arenas, Inc. and of Las Colinas, Inc., there is no doubt that Mr. Schreibman was authorized, among other things, on behalf of the corporation, to sign, execute, assign, pledge and deliver, or in any other manner transfer to the Bank, as security for money borrowed or as security for any documents or accounts assigned, such contracts, promissory notes, mortgages and pledges as might be required by the Bank. He was also authorized to execute and deliver such additional securities as the Bank from time to time required in order to maintain an adequate margin of security for all loans. Besides, Mr. Schreibman's actions at the time he issued the $2,000,-000.00 note, executed the mortgage to secure said note and delivered both documents as pledge to Banco Popular, were approved and consented to by almost all the directors of Las Colinas, Inc., some of them, the majority, by signing written consents on December 20, 1963, and others by telephone. Under these circumstances, we conclude that Mr. Schreibman acted with full authority at the time he issued and delivered to Banco Popular the $2,000,000.00 mortgage note, which authority he now contests.

Las Colinas, Inc. issued on February 4, 1963 a mortgage note in the amount of $750,000.00 Payment of this note was secured by a mortgage constituted by Deed Number 25, executed on February 4, 1963 before Notary Edilberto Berríos Dávila. Banco Popular has never attempted to foreclose this mortgage, although it still has the mortgage note in its possession. The land encumbered by or subject to this mortgage was the rest of the land which was part of the project, although no development or construction of houses was ever started on this land. This land is composed of several tracts of land or parcels, and each of them was subject to a mortgage securing the payment of the purchase price owed.

Banco Popular requested additional security, for the reason that since before December 1963 it had security only in the amount of $1,000,000.00, which was less than the total loans advanced by it to Debtors. At that time, Banco Popular requested that another mortgage be constituted on the land under development, since it represented the best security. Las Colinas, Inc. executed the $2,000,-000.00 mortgage, which exceeded the actual debt, because at that time Las Colinas, Inc. was requesting another additional line of credit, which was the subject of negotiations between the parties. There is no evidence that the parties ever reached an agreement as to this new request for an additional line of credit. The fact that Banco Popular received the $2,000,000.00 mortgage note on or about the time that the negotiations for the new request took place cannot be considered as proof of the existence of an agreement. The Bank had received a $750,000.00 mortgage note which it considered was not the best security as the note was secured by a mortgage of several undeveloped and encumbered parcels of land. The Bank preferred to have the additional mortgage security on land which was being developed and where the amounts advanced by it were expended. It is an uncontroverted fact that the $2,000,000.00 mortgage note exceeded the actual debt, but as has been already stated, Las Colinas, Inc. had requested additional sums of money and at the time such request was being considered and discussed by the parties, it seemed practical and logical to issue and deliver a mortgage note in excess of the debt which could serve as security in case the request for additional financing was approved by the Bank.

Las Colinas, Inc., Arenas, Inc., Ceiba Corporation and Eastern Construction Corporation were merged, the resulting corporation being Las Colinas, Inc. The consolidation agreement was presented to the Registry of Property of Humacao, Puerto Rico, on November 8, 1963, as is conclusively shown by the Registry Certificate issued on February 3, 1964. The three (3) mortgage deeds were recorded and are still recorded at the Registry of Property of Humacao. Deed

Number 53, executed on April 26, 1962 before Notary Rafael Baragaño Diez, was recorded at pages 108 and 85 of Volume 93 of Fajardo, parcels number 2974 and 2073; Deed Number 26, executed on February 5, 1963, before Notary Edilberto Berríos Dávila, was recorded at pages 108 and 87 of Volume 93 of Fajardo; and Deed Number 374, executed on December 20, 1963, before Notary Edilberto Berríos Dávila, was recorded at pages 102 and 88 of Volume 93 of Fajardo.

There is also a controversy as to the title Banco Popular has over a parcel of 196 cuerdas, formerly belonging to the Debtors. This parcel was purchased by Banco Popular at a public sale, pursuant to the foreclosure of the mortgage encumbering said parcel. The mortgage foreclosure was initiated by the Penedo family, who was a mortgage lien creditor. Las Colinas, Inc. owed around $147,123.59 of principal to the Penedo family, said amount being the balance of the purchase price of the encumbered property. On several occasions, Las Colinas, Inc. had requested loans from Banco Popular in order to pay the mortgage, and Banco Popular refused to advance money for such purposes. On December 27, 1963, the Penedo family obtained judgment in its favor and against Las Colinas, Inc., and the public sale of the parcel was effected on March 24, 1964. Banco Popular appeared at this sale and offered through its attorney Rafael Baragaño Diez the sum of $179,000.00 which was the highest bid made. On March 25, 1964, the Marshal of the Superior Court of San Juan executed Deed Number 73 before Notary Garrard Harris and officially conveyed to Banco Popular, by this act, title over the 196-cuerda parcel. This deed was recorded at page 71 of Volume 93 of Fajardo, said recording as to property number 2972. Debtors in Possession argued before this Court that the property acquired by the Bank at the judicial sale had a value of more than twice the amount paid by the Bank; that the Bank's Board of Directors authorized some Bank officers to bid an amount of more than twice the amount paid by Banco Popular for the property; that the Bank had given assurances to Las Colinas, Inc. that the Bank was going to advance the funds necessary to pay the mortgage in order to prevent the foreclosure sale; and that Las Colinas relied upon these representations of the Bank and allowed the Bank to take title to Las Colinas' 196-cuerda parcel in its name. By reason of the foregoing, Debtors claim that Banco Popular should be considered a constructive trustee of the property. This whole argument is based on alleged facts which we deem do not support such claim. This Court considers as established the fact that Banco Popular de Puerto Rico on several occasions informed several officers of Las Colinas, Inc. that the Bank was willing to reconvey the 196-cuerda parcel to Las Colinas, Inc. if Las Colinas paid back all the amounts owed by it to Banco Popular de Puerto Rico.

It should be mentioned that at the end of 1963 Las Colinas, Inc. was having economic hardships. Due to this circumstance and to delays in the development of the land and construction of houses, Section One of the project was never finished. Las Colinas, Inc. requested additional credits from Banco Popular and, as we stated before, prolonged negotiations and meetings were held by the two parties. This Court considers that it has not been established that Banco Popular ever agreed to go beyond the line of credit approved. All this brought the initiation of foreclosure proceedings by Banco Popular, which filed the same on July 6, 1964 at the Superior Court, Humacao Part. Banco Popular also recorded a Notice of Pending Suit (Lis Pendens) in the Registry of Property, at the time the foreclosure suit was filed. It was thereafter that Las Colinas, Inc. and Eastern Shore Development Corporation filed the Petition for Arrangement under Chapter XI of the Bankruptcy Act. This petition was filed on October 15, 1964.

## CONCLUSIONS OF LAW

■■ Obligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with the terms thereof. Article 1044 of the Civil Code, 1930 edition, 31 L.P.R.A. Sec. 2994;[1] Caribbean Industries, Inc. v. Camacho, 71 P.R.R. 726 (1950). When the lines of credit granted by Banco Popular to Arenas, Inc. and Las Colinas, Ins. were totally exhausted, and Las Colinas, Inc. was left with no other economic means to complete the work, sell the lots and the houses and pay back the loans to the Bank, the latter was entitled to demand payment of all the amounts owed. Payment of said amounts did not depend on the fulfillment of any obligation by the Bank. Neither the notes delivered as evidence of the debt nor the mortgage notes, pledge agreements and mortgage deeds, nor any other document submitted in evidence conditioned the payment of the amounts owed to the fulfillment of any obligation by Banco Popular de Puerto Rico.

■ When notes are payable on demand, without any condition to the contrary, and this is the case of the notes that evidence the debt in this case, it is not necessary to demand payment to give rise to the maturity of the obligation. It is a general rule of law that a demand note is payable immediately on the date of its execution and that it is due upon delivery thereof, unless a contrary intention appears expressly or implicitly upon the face of the instrument. See, 71 A.L.R.2d 290, Sec. 3; 147 A.L.R. 1109, Sec. 13. In other words, a right of action against the maker of a demand note arises immediately upon delivery and no express demand is required to mature the note or as a prerequisite to such right of action, the commencement of a suit being sufficient demand for enforcement purposes. Bank of Nevada v. United States, 251 F.2d 820 (9th Cir. 1957); Brummagim v. Tallant, 29 Cal. 503; 71 A.L.R.

2d 295 (1866); Articles 436 and 437 of the Commercial Code of Puerto Rico, 1932 edition, 19 L.P.R.A. Secs. 144 and 145. The notes, payment of which is claimed in this case by Banco Popular de Puerto Rico, being payable on demand, were payable immediately on the date of their execution and delivery to Banco Popular, and no prior demand was required for their collection through judicial proceedings. Servera Silva v. Pedrosa, 43 P.R.R. 676 (1932). Banco Popular would have been estopped only if its right to demand payment would have been conditioned on its fulfillment of certain conditions, in the nature of reciprocal obligations. But that was clearly not the situation in this case. As was stated by the Supreme Court of Puerto Rico in Madera v. Madera, 49 P.R.R. 159 (1935), where an undertaking to pay a promissory note is not subject to the conditions contained in another contract in which the promissory note and mortgage originated, the nonperformance of these conditions cannot serve as an excuse for the failure to comply with the obligations under the promissory note, nor can it serve as a defense to an action brought to foreclose the mortgage securing it. See also, Article 1053 of the Civil Code, 31 L.P.R.A. Sec. 3017.

■ The three bearer mortgage notes delivered to Banco Popular as collateral security or pledge secured the payment of the principal amount owed, as well as the interest that such obligations accrued, and the costs, expenses, disbursements and attorneys' fees stipulated in each note. According to the terms of the General Pledge Agreements subscribed by Arenas, Inc. and delivered to Banco Popular de Puerto Rico, the securities delivered as collateral or pledge secured payment in a general and broad sense of all the debts and obligations of debtors in favor of Banco Popular de Puerto Rico. Besides the fact that we deem that the term obligation, as it is used in the pledge agreement, refers to and includes instruments or documents

---

1. All references to the Civil Code are to the 1930 edition.

that represent or evidence sums of money payable by the person that issues them, and that in the notes that evidence the debt, payment of which is claimed, the parties stipulated the payment of principal, interest thereon, costs, expenses, disbursements and attorneys' fees, we conclusively understand that the provisions contained in Articles 1111 and 1122 of the Civil Code, 31 L.P.R.A. Secs. 3161 and 3172, are applicable. Both sections deal with the payment of debts. Article 1111 establishes that a debt shall not be considered as paid "until the full amount of the thing has been delivered, or the prestation of which the obligation consisted has been made." On the other hand, Article 1122 refers to the judicial or extrajudicial expenses arising from the collection of debts. In this case, the parties stipulated in each of the 83 notes and in each of the 3 bearer mortgage notes the principal sums, the interest thereon, cost, expenses, disbursements and attorneys' fees in the event of recourse to the courts in order to collect the amounts owed. Debtors' obligation consisted in the payment of all these amounts mentioned above and stipulated in the notes, and the securities given also extended to all these amounts that are part of the whole debt. Article 1122 of the Civil Code establishes, as to the expenses incurred by the creditor in the judicial collection of his credit, that the court "shall decide in accordance with the law of civil procedure." However, although this refers to Rule 44 of the Rules of Civil Procedure of Puerto Rico, which regulates the award of costs and attorneys' fees in civil cases, Article 1122 and Rule 44 only apply in cases in which there is no written stipulation to the contrary as to these matters. Where, as in the case before us, the promissory and mortgage notes expressly contain a stipulation as to costs, expenses and attorneys' fees, this contractual stipulation has legal force between the contracting parties. See, Clausells v. Salas, 51 P.R.R. 87 (1937); Cintrón & Aboy v. Solá, 22 P.R.R. 245 (1915). In cases where there is a stipulation in the instrument, the award of costs, expenses and attorneys' fees is not discretionary of the court, but are awarded as a matter of contract law. Clausells v. Salas, supra.

■ A contract without consideration is wholly void and nonexistent and has no effect whatsoever. Article 1227, Civil Code, 1930 edition, 31 L.P.R.A. Sec. 3432, Hull-Dobbs Co. v. Superior Court, 81 P.R.R. 214 (1959); Soto v. Feliciano, 80 P.R.R. 595 (1958); Monserrate v. Lopes, 80 P.R.R. 476 (1958); Guzmán v. Guzmán, 78 P.R.R. 640 (1955). But the fact that no money or property was received by the debtor from the creditor at the time an obligation is subscribed by the former, does not preclude the existence of consideration in said note. Cámara Insular v. Santiago, 83 P.R.R. 574 (1961); National City Bank v. Martínez, 41 P.R.R. 162 (1930). Any detriment to the opposite party is a valuable consideration. Bennett v. Boschetti, 31 P.R.R. 809 (1923); National City Bank v. Martínez, supra, at page 163. As a matter of law, where a promissory note is subscribed by a debtor in substitution for other prior obligations, the fact that no money or property is received from the creditor by virtue of the obligation thus subscribed, does not preclude the existence of consideration in said note, and a debtor cannot avoid liability by claiming that no benefit was received. See, Cámara Insular v. Santiago, supra. The juridical relationship between Banco Popular de Puerto Rico and Arenas, Inc. was contractually established in the General Pledge Agreements, by which Arenas, Inc., among other things, assumed the obligation of delivering additional security for the payment of the debt or else all obligations became due automatically. If no additional security would have been delivered it would have resulted not only in detriment to Banco Popular de Puerto Rico, which could have thought it did not have sufficient security, but in detriment to the debtor, who was subject to pay the whole debt to Banco Popular.

Furthermore, even though the consideration is not expressed in a contract, it is presumed that it exists and that it is licit, unless the debtor proves the contrary. Article 1229, Civil Code, 31 L.P.R.A. Sec. 3434. There was evidence presented as to the fact that Las Colinas, Inc., after delivering the $2,000,000.00 bearer mortgage note, did not receive any sum of money, except those amounts necessary to pay notarial fees and recordation expenses of the $2,-000,000.00 mortgage deed. But, assuming, arguendo, that the amounts referred to above, and the additional advance of approximately $26,000.00 received by Las Colinas, Inc. after it delivered such security, do not constitute consideration, the uncontroverted fact still remains that the prior loans were made under a pledge contract in which the delivery of additional security was stipulated, or else debtor was bound to pay the debt in full. Therefore, we must conclude that Debtors did not meet the burden of proving lack of consideration, and the presumption of Article 1229 should be given full force and effect.

A creditor who holds in pledge, as collateral security, a promissory note secured by mortgage need not become the absolute owner of the note or the mortgage in order to institute foreclosure proceedings. A creditor has sufficient interest in a promissory note pledged to him as collateral security to prosecute an action in his own name to enforce the collection thereof. Title passes to him at the time possession is transferred to him and he is entitled to claim through judicial proceedings payment of the obligation and to foreclose the mortgage, as well. All these rules of law were established by the Supreme Court of Puerto Rico in Acevedo v. Treasurer, 52 P.R.R. 446 (1938), after construing Article 1768 of the Civil Code, 31 L.P.R.A. Sec. 5027, which reads as follows:

As long as the thing given in pledge is not taken by eminent domain, the debtor continues to be the owner thereof.

Nevertheless, the creditor may exercise the actions which pertain to the owner of the thing pledged, in order to reclaim or defend it against a third person.

It is true that the nominal value of the mortgage notes held as collateral security or pledge exceeds the actual debt. But Section 44 of the Uniform Negotiable Instruments Act of Puerto Rico, 19 L.P.R.A. Sec. 44, solves this situation by establishing that:

Where the holder has a lien on the instrument, arising either from contract or by implication of law, he is deemed a holder for value to the extent of his lien.

Where a note is transferred as collateral security for the payment of a debt, it is equivalent to the establishment of a lien on the instrument, pursuant to Section 44 quoted above, and the holder may recover judicially on the note to the extent of its lien. Sorrentini & Company v. Méndez, 76 P.R.R. 646 (1954).

In addition to what has been stated before, that the $2,000,000.00 mortgage note secured, together with the other two mortgage notes, the payment of the debt claimed by Banco Popular de Puerto Rico, and that said note is liened in favor of Banco Popular de Puerto Rico, it must be noted that, in Puerto Rico, as a matter of local law, the holder of a note who takes it for an already existing debt is a holder for value received to the extent of the debt, even though such taking is merely as collateral security. See, Sorrentini & Company v. Méndez, supra; Cf. Section 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b).

So far, we have set forth, in general, the legal situation as to Banco Popular's claim. Debtors in Possession made several contentions as to the validity of such claim and also set forth several defenses against the Bank's claim. We shall consider all of these contentions and defenses as they were stated in Debtors' First Amended Consolidated Application for Relief Against Banco Popular de Puerto Rico, filed on February 23, 1968.

We have already found that, as a matter of fact, Banco Popular never agreed to advance all of the funds needed to pay the entire cost of development and construction of houses. This Court is convinced that Banco Popular's commitment was limited to the $1,750,000.00 line of credit, and that it was not willing to undertake the financing of additional work unless the work in process on the First Section of the Las Colinas Project was successfully concluded. The Court is not convinced that a banking institution will commit itself to the financing agreements alleged by Debtors. At most, evidence was contradictory in this regard, and the only written evidence in this respect points to the limitation of Banco's Popular's commitments. First, the Bank's internal memoranda clearly established that a maximum line of credit of $1,750,000.00 was in effect, and there was no written evidence that this was ever changed. Although Las Colinas, Inc., and Banco Popular held several meetings regarding the request for money in excess of the line of credit in effect, we cannot conclude, either as a matter of fact or as a matter of law, that the Bank ever agreed to grant this request. This being the juridical relation between the parties, the Court cannot make any determination as to the breach of agreements by Banco Popular. Article 1042 of the Civil Code, 31 L.P.R.A. Sec. 2992, establishes the basic rule that obligations are "created by law, by contracts, by quasi contracts, and by illicit acts and omissions or by those in which any kind of fault or negligence occurs." Article 1043 of the Civil Code, 31 L.P.R.A. Sec. 2993, provides that "obligations arising from law are not presumed," and that obligations arising from contracts should be based on contracts, the existence of which must be established. The burden of proof rests on the party demanding compliance with an obligation to show the existence of the same and, if said party fails to prove his case, the other party should be discharged from liability. See, Article 1168 of the Civil Code, 31 L.P.R.A. Sec. 3261;

Martínez v. García, 18 P.R.R. 2, 4 (1912); Olivieri v. J. Tornabells & Co., 7 P.R.R. 92 (1904). Therefore, in the absence of contractual obligations, there can be no breach of agreement which could be imputed to Banco Popular de Puerto Rico.

Debtors also allege that the repeated assurance of Banco Popular as to its financial commitments toward them amounted to a deliberate series of false representations "designed to mislead Las Colinas, Inc., and thereby prevent it from seeking the benefit of Chapter XI of the Bankruptcy Act within four months from the date on which the Bank received and recorded the [$2,000,000.00] Bearer Mortgage." They claim that the Bank's conduct was fraudulent and that by virtue of such conduct, Debtors have suffered actual damages in the sum of approximately $3,000,000.00.

Article 1054 of the Civil Code, 31 L.P.R.A. Sec. 3018, establishes the general rule that those who "in fulfilling their obligations are guilty of fraud * * * and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnity for the losses and damages caused thereby." As we have already stated, in the absence of obligations contracted by a party, there is no doubt that Banco Popular could not be charged with fraud in "fulfilling" its obligations.

Besides, there are other legal obstacles to such adjudication. First, there is the legal presumption that everybody acts in good faith and that private transactions are conducted in good faith and according to law. Whoever alleges fraud has to destroy these presumptions. This Court is of the opinion that the presumption of good faith was not destroyed by Debtors. There is no certainty that Banco Popular made false representations in order to defraud Las Colinas, Inc. At least, four elements should be established in a charge of fraud:

1. the intent to defraud

2. reliance on the fraudulent acts

3. the false representations used to consummate the fraud

4. that the fraud was *consummated by virtue of such representations*

See, Chanin v. Chevrolet Motor Co., 89 F.2d 889, 111 A.L.R. 1235 (7th Cir. 1937); South Branch Lumber Co. v. Ott, 142 U.S. 622, 12 S.Ct. 318, 35 L.Ed. 1136 (1892); Cooper v. Schlesinger, 111 U.S. 148, 4 S.Ct. 360, 28 L.Ed. 382 (1884); 37 Am.Jur.2d Fraud and Deceit, Secs. 188, 434 and 435; Rubio Meléndez v. Examining Board, 47 P.R.R. 880 (1934); S. Canet & Co. v. N. Santini, 44 P.R.R. 78 (1932).

 Since the presumption is in favor of the good faith and honesty and against fraud, the party who alleges fraud must prove its existence with uncontroverted and unchallengeable facts. Bamberger v. Schoolfield, 160 U.S. 149, 16 S.Ct. 225, 40 L.Ed. 374 (1895); Continental Casualty Co. v. First National Bank, 116 F.2d 885, 135 A.L.R. 1141 (5th Cir. 1941); In re Black Ranches, Inc., 362 F.2d 19 (8th Cir. 1966); Monclova v. Financial Credit Corp., 83 P.R.R. 742 (1961); Serrano v. Torres, 61 P.R.R. 157 (1942); The Texas Co. v. Estrada, 50 P.R.R. 709 (1936). The fact that this Court may act as a court of equity does not change the above mentioned rule. Hager v. Thomson, 66 U.S. (1 Black) 80, 17 L.Ed. 41 (1861); Hempstead v. Johnston, 18 Ark. 123 (1856); Southern Development Co. of Nevada v. Silva, 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed. 678 (1888). Besides the burden of proof, the party who alleges fraud must produce evidence which is *strong, clear, unchallengeable, convincing and conclusive, since a mere preponderance of the evidence is not sufficient to establish the existence of fraud in our jurisdiction.* See, Monclova v. Financial Credit Corp., 83 P.R.R. 742 (1961); Calzado et al., v. Carrero et. al., 15 P.R.R. 340 (1909); Ana María Sugar Co. v. Castro et. al., 28 P.R.R. 225 (1920); Núñez v. Rodríguez, 51 P.R.R. 622 (1937); Mario Mercado e Hijos v. Olivieri, 60 P.R.R. 855 (1942); Lundstrom v. Radio Corporation of America, 17 Utah 2d 114, 405 P.2d 339, 14 A.L.R.3d 1058 (1965); Master v. Master, 223 Md. 618, 166 A.2d 251 (1960); Buzard v. Griffin, 89 Ariz. 42, 358 P.2d 155 (1961). Mere conclusions, conjectures, and suppositions or suspicions are not of themselves sufficient to substantiate an allegation of fraud. Serrano v. Torres, supra. Where one party alleges a conspiracy to defraud, until such conspiracy is proved, the other parties are subject to no more suspicion than would any other defendants called as witnesses, and their testimony, although interested, must be presumed to be true until duly discredited. Ana María Sugar Co. v. Castro, supra; In re Jersey Materials Co., 50 F.Supp. 428 (E.D.N.J.1943). Apparently, Debtors pretend that we can infer fraud from the fact that Las Colinas, Inc., had to request the benefit of the rehabilitation proceedings of Chapter XI of the Bankruptcy Act. However, there is no doubt that Las Colinas' failure and weak financial condition arose from the facts that it had no working capital and was unable to complete the works on time. See, Monclova v. Financial Credit Corp., supra.

 This Court concludes that Debtors did not destroy the presumption of good faith that operates against a charge of fraud. There was contradicted and controverted evidence as to the alleged commitments and obligations. We have already concluded that Banco Popular only committed itself to lend up to $1,750,000.00 and that it actually lent in excess of that amount. If this is an established fact, and we conclude it is, it follows that no representations were made by Banco Popular designed to mislead, or with intent to defraud the Debtors. If the facts are susceptible of a natural and probable explanation which is compatible with the good faith and honesty of the parties, fraud is not established. Calzado, et. al. v. Carrero, et al., 15 P.R.R. 340 (1909); Feliciano v. P. Cedeño, 78 P.R.R. 37 (1955).

 Debtors in Possession allege that each mortgage was recorded as to

more than one parcel of real property without recording a determination of the amount of actual debt for which each property was responsible. It is argued that since actual debt was less than the total amount of mortgage responsibility, the records at the Registry of Property should have shown the amount of actual debt for which each property was responsible. This argument is allegedly based on the provisions of Article 119 of the Mortgage Law and Article 164 of the Mortgage Regulations, which state as follows:

> When a number of estates are mortgaged at the same time for a single credit, *the amount or part of the lien to be borne by each* shall be determined * * * (30 L.P.R.A. Sec. 215—Emphasis supplied).

> Registrars shall not record any mortgage on different properties subject to the same obligation, unless by agreement between the parties or by a judicial order in a proper case, the amount which each estate is to secure shall be determined. (30 L.P.R.A. Sec. 1085).

It is obvious that Debtors based their arguments on an erroneous construction of Articles 119 of the Law and 164 of the Regulations. Both articles refer to *"the lien to be borne by each"* estate and to the amount of the mortgage debt which each estate is to secure. In this case, both articles were complied with, since in all mortgages the amount of the lien to be borne by each estate was expressly determined in the mortgage deeds. There is no indication in any of the two above mentioned articles that when the mortgage lien is greater than the actual debt a determination should be made as to the responsibility of each estate with regard to the actual debt. As a matter of law, the Mortgage Law expressly rejects Debtors' argument by providing in Article 122 that:

> The mortgage shall continue intact as long as it is not cancelled *on all the property mortgaged, even though the obligation secured be reduced * *

(30 L.P.R.A. Sec. 218—Emphasis supplied).

We must emphasize that in the above quoted article the Mortgage Law makes a distinction between mortgage lien and obligation secured, and provides that the obligation secured could be reduced, but still the mortgage lien shall continue intact. Article 124 of the Mortgage Law regulates the situation in which a mortgage created for the security of a debt is divided among a number of estates, and an amount equivalent to the lien encumbering one of said estates is paid. This article provides that the "person interested may apply for the *partial* cancellation of the mortgage as to the said estate." (Emphasis supplied.) If release from the mortgage of one or the other of the mortgaged estates may be obtained, because the amount paid exceeds the lien on one as well as the other estate the debtor shall select the one which is to be freed from encumbrance. See, 30 L.P.R.A. Sec. 220, and Muriente v. Yumet, 58 P.R.R. 619 (1941). 2 Fernando Campuzano y Horma, Legislación Hipotecaria, pp. 108–116 (2d ed.). The fact that the mortgage lien is greater than the actual debt does not make the mortgage null. The mortgage creditor is only entitled to collect the exact amount owed as capital and interest. See, article 169 of the Mortgage Regulations, 30 L.P.R.A. Sec. 1090; Delgado v. Banco Popular, 55 P.R.R. 912 (1940). We cannot forget that in this case the creditor, Banco Popular de Puerto Rico, is the holder of bearer mortgage notes. A mortgage which secures a promissory note payable to the bearer is not a bilateral contract when it is made, nor can it be considered such until the promissory note is negotiated. It is not until the debtor receives the loan and the creditor accepts the promissory note that the mortgage contract becomes valid and binding on both contracting parties. Morales v. Registrar, 54 P.R.R. 520 (1939). It is at the time the promissory note is delivered that the mortgage is perfected and the amounts loaned or advanced under a con-

tract become secured up to the amount of the mortgage. The extent of the mortgage becomes at such time the amount of the debt, unless the debt be greater than the amount of the mortgage.

Debtors refer to the case of Crédito y Ahorro Ponceño v. Registrar, 30 P.R.R. 131 (1922), which explains the reason behind Articles 119 and 164. This Court is of the opinion that that case is not applicable to our situation since in our case the amount which each estate is to secure was determined in the mortgage deeds. In this case we cannot say that a "subsidiary mortgage" was created, since each estate did not secure the whole principal, but only part thereof. The evils pointed out in the *Crédito y Ahorro Ponceño* case are not present in this case, since debtors still have recourse to Article 124 of the Mortgage Law and could have obtained the partial cancellation of the mortgage as to any of the estates if the amounts secured by any said estate had been paid. This course of action was not possible in the *Crédito y Ahorro Ponceño* case where each estate secured the part of the debt and also the full amount of the debt through the "subsidiary mortgage."

Debtors also argue that Article 12 of the Mortgage Law was violated. This Article reads as follows:

The entries of mortgages securing debts shall in every case set forth the amount of the obligation and of the interest secured if any; and in the absence of such statement as to interest none shall be considered secured by the mortgage, according to the provisions of this subtitle. (30 L.P.R.A. Sec. 37)

This argument has no factual basis. First, the above mentioned article is of an administrative character, and only establishes the circumstances a mortgage entry should contain. Furthermore, in this case all the mortgage deeds set forth the amount of the obligation and of the interest secured, as well as the amount of other items secured.

Debtors next argue that Articles 9, 30 and 32 (30 L.P.R.A. Secs. 34, 55 and 57, respectively) were also violated, and that, consequently, the mortgages are void as to third-party creditors. Debtors erroneously assert that the records in the Registry of Property should have set forth the facts that the mortgages were "constituted to secure conditional future obligations which might or might not come into existence depending upon the occurrence of future events." The parties in this case did not contract on the basis of conditional obligations or of obligations which might or might not come into existence. The securities, issued by Debtors and owned and held by them, were delivered to guarantee payment to Banco Popular of financial accommodations agreed upon. The notes and the mortgages were not instruments made to Banco Popular. They were Debtors' instruments, under Debtors' *ex parte* contracts, to be used by them as they might choose. They chose to use them as security for financial accommodations agreed upon with Banco Popular. Las Colinas' duty or obligation to pay back its debt to Banco Popular did not depend on any resolutory or suspensive condition. Article 1066 of the Civil Code, 31 L.P.R.A. Sec. 3041, governs this situation and clearly establishes in its first paragraph that:

Every obligation, the fulfillment of which should not depend upon a future or uncertain event or upon a past event, unknown to the parties in interest, shall be immediately demandable.

It cannot be argued that the Bank's right to collect the money owed to it depended on certain conditions. At the time it advanced the money, the Bank acquired the right to claim its payment and debtor became bound to return to the Bank an equal amount of money and the interest thereon. See Articles 1644 and 1646, 31 L.P.R.A. Secs. 4571 and 4573; Espino v. Frías, 7 P.R.R. 541 (1904). It is a well known rule of law that in conditional obligations, the acquisition of rights, as well as the extinction or loss of those al-

ready acquired, shall depend upon the event constituting the condition. Article 1067 of the Civil Code, 31 L.P.R.A. Sec. 3042. In our case the Bank's right did not depend on any condition. In Amy v. Registrar of Property, 21 P.R.R. 114 (1914), the Supreme Court of Puerto Rico clearly established the differences between the maturity and the conditions of obligations, and both must be distinguished in order not to confuse a deferred obligation with a conditional one. It then was stated that the "condition" is an uncertain event, whereas the *term* is an event which is bound to take place, even though it is not known when. Thus, the basic difference is that the condition may be such that the obligatory relation may or may not have effect, whereas the *term* merely places a limitation upon the time when the contractual relation shall take effect. 21 P.R.R. 114, 118 et seq. The essential element of a conditional obligation is the uncertainty of its *occurrence*. 8 Manresa, Comentarios al Código Civil Español, Part 1, pp. 309, 301 to 321 (1950 ed.); 1 Puig Brutau, Fundamentos de Derecho Civil, Part 2, pp. 118 to 148; 4 Puig Peña Tratado de Derecho Civil, Part 1, p. 118; 3 José Castán Tobeñas, Derecho Civil Español, Común y Foral, pp. 143 to 156 (10th ed., 1967).

The cases of Gaztambide v. Heirs of Ortiz, 70 P.R.R. 338 (1949); Galiñanes Hnos. v. Registrar, 65 P.R.R. 541 (1946); Ortiz v. Registrar, 16 P.R.R. 643 (1910); and Crédito y Ahorro Ponceño v. Registrar, 30 P.R.R. 131 (1922), are not applicable to this case, since in all of these cases the mortgage deeds in one way or another did not establish the part of the lien to be borne by each separate estate, while in this case all of the mortgage deeds made such determination, making possible the partial liberation provided for in Article 124 of the Mortgage Law, 30 L.P.R.A. Sec. 220. The reason why Article 119 of the Mortgage Law requires that the mortgage responsibility be distributed among several estates is that the creditor cannot have any recovery to the prejudice of third persons, in excess of the amount for which each estate may be respectively encumbered, together with the interest thereon. Article 119 of the Mortgage Law (30 L.P.R.A. Sec. 215). If the actual debt is less than the amount to be borne by each of the estates mortgaged, it cannot be argued that such circumstance is prejudicial to third persons, since the creditor is only entitled to collect up to the amount actually owed to him.

In this case, the Bank asserts the right of mortgage foreclosure on the fact that it is a pledgee of bearer notes secured by mortgages. The pledges of the First Arenas $500,000.00 Bearer Note and the Second Arenas $500,000.00 Bearer Note were made as a result of the provisions of the Arenas' General Pledge Agreements (Exhibits 41 and 42). The Bank also claims that the Las Colinas $2,000,000.00 Bearer Note was also made under the provisions of the Pledge Agreements executed by Arenas. Debtors in Possession claim that the pledges asserted by the Bank are not valid because they were invalid against third parties under the laws of Puerto Rico. Debtors state that the pledges are not valid as to third parties by reason of Article 1764 of the Civil Code, 31 L.P.R.A. Sec. 5023, which reads as follows:

A pledge shall not be effective against a third person, when evidence of its date is not shown by authentic documents.

"Authentic document" is any document executed or subscribed before a notary public or that qualifies as an affidavit within the provisions of the law. Bonilla v. Santiago, 30 P.R.R. 229 (1922), 4 L.P.R.A. 887; Ramos Mimoso v. Superior Court, 93 P.R.R., 93 D.P.R. 551 (1966).

Besides the requisites mentioned in Article 1756 of the Civil Code (31 L.P.R.A. Sec. 5001), it is necessary, in order to constitute the contract of pledge, that the pledge should be placed in possession of the creditor or of that of a third person, by mutual consent.

Art. 1762 of the Civil Code, 31 L.P.R.A. Sec. 5021. In other words, once the contract complies with the requisites mentioned in Article 1756 and the pledge is in possession of the creditor, the contract is perfected as between the contracting parties. This is why a pledge is a real contract. See, 12 Manresa, Código Civil Español, pp. 417, 418–422 (1951). In order to prevent frauds, the Civil Code establishes that a pledge shall not be effective against a third person, "when evidence of its date is not shown by authentic documents." Article 1764, 31 L.P.R.A. Sec. 5023. As long as no third person attaches or in any other way obtains a lien on the thing pledged, the contract of pledge is absolutely valid between the contracting parties. In our case there is no question that the promissory notes were legally and duly delivered to Banco Popular, and the Bank had the notes in its possession at the time it initiated the foreclosure proceedings at the Humacao Court, at which time it also caused a *lis pendens* to be entered in the records of the properties mortgaged. The Bank had the General Pledge Agreements subscribed by Arenas, Inc. and these documents were "authentic documents," since each of them had an affidavit accrediting that both were signed before a notary public. We must then try to answer the following question: What is the date that should be shown by authentic documents? There is no doubt that Article 1764 does not refer to the date the pledge is delivered, but to the date the pledge contract is constituted. See, 25 Enciclopedia Jurídica Española, Prenda, p. 387; Manresa, op. cit., p. 432. On the other hand, the authentic document referred to in Article 1764 does not have to contain any information as to other circumstances of the contract, but its only purpose is to evidence the date the contract is constituted. See, Manresa, op. cit., p. 432. The fact that some of the mortgage notes were delivered to the Bank after the General Pledge Agreements were authenticated before a notary public does not make the pledges defective as against third persons, since the pledge agreements evidence the date the pledges were constituted.

In any event, the jurisprudence admits that if the date has become certain by another means, that suffices. 2 Planiol, Traité Elementaire de Droit Civil, Part 2, No. 2419, p. 373. We should not confuse the facts as they occurred in this case. Several months before the Petition for Arrangement was filed by Debtors, Banco Popular de Puerto Rico had caused a *lis pendens* to be entered in the records of the mortgaged properties in the Registry of Property. Banco Popular de Puerto Rico had initiated a judicial proceeding claiming the status of a pledge creditor, indubitably establishing the existence of a debt. The Bank had at that time the possession of the mortgage notes pledged. After this date, a third person could not obtain a better right on these notes. At the time the Petition for Arrangement was filed, the pledges were effective *erga omnes*, since long before the filing of the petition there was no possibility that a third person could obtain a senior lien or preferred lien on these notes. In a situation like this, we might say that Article 1764 is not applicable since the possibility of an *a posteriori* fraudulent claim, which Article 1764 tries to prevent, is no longer possible. At the time foreclosure proceedings are initiated, the existence of the claim or obligation is indubitably revealed to the world.

We have stated before that Arenas, Inc., Ceiba Corporation and Eastern Construction Corporation were merged into Las Colinas, Inc. The Consolidation Agreement was presented to the Registry of Property on November 8, 1963. This Court had before it a Certificate issued by the Secretary of State of Puerto Rico in which it is stated that the Consolidation and Merger Agreement was filed in the Department of State and that all legal requirements were complied with, by virtue of which the predecessor corporations were dissolved, Las

Colinas, Inc. assuming all the rights, contracts and obligations, including title to real estate, of the dissolved corporations. It may be argued that the agreement filed in the Registry of Property regarding the merger had not yet been recorded in the office of the Department of State. However, recordation of an agreement of merger or consolidation does not create rights or obligations. The agreement itself does that. Recordation is merely the evidence that the agreement was entered into. The agreement was later recorded, and the evidence of recordation was brought before this Court. We cannot now say that title to land acquired by Las Colinas, Inc. under an agreement is not valid because at the time title was claimed and asserted the agreement pursuant to which title had been acquired had not been recorded. Be that as it may, the agreement of merger or consolidation was later recorded and there can be no question that whatever defects might have existed were cured, and that title to the land was vested in Las Colinas, Inc. since the agreement, which was later recorded, was executed by the parties to the merger or consolidation.

It is a well established rule of law that in the case of a consolidation or merger, the consolidated or absorbing corporation becomes vested with whatever title or interests the old corporations had in the property, without further act or deed. This transfer is made by operation of law. See, Section 903 of the Corporation Law (14 L.P.R.A. Sec. 1903); 15 Fletcher, Cyclopedia of the Law of Private Corporations, Secs. 7088, 7102 et seq. (1961); American Cement Corporation v. Dunetz Bros., Inc., 47 Misc.2d 747, 263 N.Y.S.2d 119 (1965); First Wisconsin Trust Co. v. Johnson, 173 Wis. 564, 181 N.W. 828 (1921). Upon the consolidation or merger, "all rights, privileges, powers, and franchises as well of a public as of a private nature, and being subject to all restrictions, disabilities and duties of each of such corporations so consolidated or merged," and "all debts due, liabilities and duties

of the respective constituent corporations shall attach to the resulting or surviving corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." See, Section 903 of the Corporation Law (14 L.P.R.A. Sec. 1903), Fletcher, op. cit., Sec. 7102, et seq. By virtue of these rules of law, Las Colinas, Inc. became bound under the Pledge Agreements subscribed by Arenas, Inc., and the contractual obligations created under the provisions of said contracts can be enforced against Las Colinas, Inc. to the same extent as if said obligations had been incurred or contracted by it. See, Drug, Inc. v. Hunt, 5 W.W.Harr., 339, 35 Del. 339, 168 A. 87 (1933); State ex rel. v. American Bonding & Casualty Co., 213 Iowa 200, 238 N.W. 726 (1931).

As to the recordation of the $2,000,000.00 mortgage executed by Las Colinas, Debtors allege that said mortgage is void by virtue of the provisions of Article 126 of the Mortgage Law (30 L.P.R.A. Sec. 222). It is alleged that Las Colinas, Inc. was not the owner of record of the property encumbered at the time of the execution and presentation of the mortgage deed, and that such mortgage is void notwithstanding the fact that Las Colinas, Inc. had become the owner thereof. It is true that at the time of the execution of the deed, Las Colinas, Inc. was not the *owner of record* of the properties encumbered. However, the mortgage deed was presented to the Registry together with the Consolidation or Merger Agreement and supplementary documents. Article 126 of the Mortgage Law reads as follows:

A mortgage constituted by a person who according to the registry has no right so to do, shall not be valid, even though the mortgagor shall subsequently acquire such right.

Although a literal reading of Article 126 tends to support Debtors' contention, it is obvious that once again Debtors have failed to consider the cases that have construed Article 126. Galindo

y Escosura, two eminent authorities in the field of Spanish Mortgage Law, clearly set forth the construction to be given to Article 126. They have made a thorough analysis of court rulings construing Article 126, and the relation of said article to other articles of the Mortgage Law. And they state that Article 126 should not be considered by itself since there are other provisions that should be harmonized with it, and that, for this reason, the scope of Article 126 must be restricted. As the basis for this argument, the authors cite certain rulings issued by the Administrative Courts of Spain (Dirección de los Registros), which have concluded that by virtue of Article 20 of the Mortgage Law [2] the owner of a property could legally encumber it before he became the owner of record. See, 3 Galindo y Escosura, Comentarios a la Legislación Hipotecaria de España, pp. 275 to 278 (4th ed., 1903); Resolución de la Dirección General de los Registros de España, dated October 1, 1874; Resolución, dated May 23, 1874. Considering the construction given to Article 126 in Puerto Rico, it would be convenient to quote a paragraph from the treatise written by Luis Muñoz Morales:

> But this provision of the Mortgage Law [Art. 126] cannot be construed literally, since all that the Civil Code requires is that the property or right to be mortgaged must belong to the person who mortgages it, even though he has not yet become the owner of record * * * (2 Lecciones de Derecho Hipotecario, p. 46 (1946).

There is no basis for Debtors' contention that Article 126 should be construed literally and independently of all other provisions of the Mortgage Law. Galindo's and Morales' position has not only been followed by the courts and administrative bodies of Spain [3] but it has been expressly followed by the Supreme Court of Puerto Rico. In the case of Amy v. Registrar, 21 P.R.R. 114 (1914), the Supreme Court ruled that a mortgage deed executed by a person who was not the owner of record at the time of execution, was valid and was recordable, subject to the condition that, prior to its recordation, the property be recorded in the name of the mortgagor. See also, González v. Registrar, 14 P.R.R. 255 (1908); Dávila v. Registrar, 20 P.R.R. 143 (1914). Therefore, the $2,000,-000.00 mortgage was valid since it was executed by the legal owner according to the provisions of the Civil Code and Article 20 of the Mortgage Law. Of course, the recordation of this mortgage had to be practiced after the properties mortgaged were recorded in the name of Las Colinas, Inc. in virtue of the Consolidation Agreement presented. In our case, this was exactly what the Registrar did; and under the rules established by the above mentioned cases, we are forced to conclude that the Registrar acted properly and according to law.

▪ Finally, we consider Debtors' contention as to the 196-cuerda parcel acquired by Banco Popular at a judicial sale at which it paid the sum of $179,000.00. Debtors claim that the Bank must be deemed a constructive trustee of the 196-cuerda parcel and that Debtors in Possession are entitled to recovery of title to, and possession of, said land. The general rule is that the burden of proving the existence of a trust is on the party alleging its existence. Prevost

---

2. In order to permit the record of or entry of deeds * * * encumbering the ownership * * * of real property or property rights, the interest of the person executing it or of the person in whose name the * * * encumbrance is made must first appear of record.
*Registrars shall* refuse to record such deeds until this requisite shall have been complied with * * * (30 L.P.R.A. Sec. 45. Emphasis supplied.)

3. It is most revealing that the Spanish Mortgage Law of 1909 no longer has an article equivalent to the present Art. 126 of Puerto Rico, avoiding in this way the confusion created by said article. See 4 Morell y Terry, Comentarios a la Legislación Hipotecaria, p. 43 (1918).

v. Gratz, 19 U.S. (6 Wheat.) 481, 5 L.Ed. 311 (1821); Logan v. Logan, 112 S.W.2d 515 (Tex.Civ.App.1937); 54 Am. Jur., Trusts, Sec. 602, pp. 465–66. To discharge this burden it is required that Debtors' proof be clear and satisfactory. Where a person seeks to enforce a constructive trust he has the burden of establishing facts which give rise to such a trust, and he must establish such facts by clear and convincing evidence, since it is not enough to establish them by mere preponderance of the evidence. Shapiro v. Rubens, 166 F.2d 659 (7th Cir. 1948); National Waste Co., Inc. v. Spring Packing Corp., 200 F.2d 14 (7th Cir. 1952), cert. denied 345 U.S. 909, 73 S.Ct. 649, 97 L.Ed. 1344 (1953); Keates v. Register, 74 F.Supp. 966 (E.D.Pa. 1947); Jacoby v. Shell Oil Co., 196 F.2d 855 (7th Cir. 1952); Smith v. Connor, 87 Ariz. 6, 347 P.2d 568 (1959); Mc-Combs v. McCombs, 227 Ark. 1, 295 S.W. 2d 774 (1956); Honaker v. City of Princeton, 125 W.Va. 672, 25 S.E.2d 772 (1943).

■ In this case, Debtors did not present convincing and satisfactory evidence as to the existence of a constructive trust. Mr. Vigdor Schreibman, President of Las Colinas, Inc., testified that he first acquired knowledge that the Bank was going to acquire the 196-cuerda parcel in its own name two hours before the auction was held. (Transcript of the Sixth Day of Trial, April 2, 1968, p. 358). He also testified that Mr. Abner Kalisch, Vice president of Banco Popular, had told him over the telephone that morning that the "bank decided it was just going to buy the property in and make it available to the company when it had the money to pay for it" (Id., p. 358). Then attorney for Debtors in Possession asked Mr. Schreibman the following question:

> Was anything said about the subject of the reason or purpose of the bank's acquiring the property?

Mr. Schreibman answered in the following way:

I don't know the reason. The bank was purchasing it. I don't think we talked about it, the purpose was simply to protect its interest and hold the company, the whole estate together and hold this property as security for the lots it was going to make in purchasing this property. (Id., p. 360.)

On behalf of the Bank, Mr. José Luis Carrión, Executive Vice president, testified that the Bank had purchased the 196-cuerda parcel because it was to the bank's advantage to purchase it. (Transcript of testimony given on August 21, 1967, p. 3). Mr. Carrión also testified that prior to the purchase he had not talked with the officers of Las Colinas in connection with the purchase of this property. (Id. at p. 5). It was clearly established that the Board of Directors of Banco Popular decided to purchase the 196-cuerda parcel the morning the auction was to be held.

■ ■ Where land is sold on foreclosure of a mortgage and the owner of the land *is induced to refrain from protecting his interest by the oral promise of another* to buy in the land on the sale and to reconvey it to the owner on his reimbursing the purchaser, the latter can be charged as constructive trustee of the land for the owner. See, 5 Scott on Trusts, Sec. 484, 89 C.J.S. Trusts § 147; Bogert, Trusts and Trustees, Sec. 494 (2d ed.). The owner of the land, who has permitted his interest to be extinguished by the sale relying upon the oral agreement of the purchaser, is entitled to be put in status quo if the purchaser refuses to carry out his promise. Scott, op. cit., Sec. 484. There was no evidence presented as to the existence of an oral agreement between Las Colinas, Inc. and Banco Popular, by which the latter promised to reconvey the property purchased to Las Colinas, Inc. All the Bank told Las Colinas was that it was willing to sell or to make the property "available" to Las Colinas. It cannot be argued that said statement, made two hours be-

fore the time set for the auction, induced Las Colinas, Inc. to refrain from protecting its interest. There was no proof that Las Colinas, Inc. refrained from bidding at the sale in reliance on the above statement. At the time the statement was allegedly made, Las Colinas had no time to raise the money to get back its property. We have to conclude that, assuming that the Bank's officer made this statement, the same is not equivalent to a declaration of trust or a promise to hold in trust. Roach v. Grant, 134 Tex. 10, 130 S.W.2d 1019 (1939).

■■■ Las Colinas' own President, Mr. Vigdor Schreibman, testified that the Bank was going to acquire the 196-cuerda parcel in its own name in order to protect the Bank's interests. Most of the decisions dealing with constructive trusts in public sales emphasize the effect of the debtors' reliance on the bidder's promise, Sandfoss v. Jones, 35 Cal. 481 (1868); Broadwell v. Smith, 152 Ga. 161, 108 S.E. 609 (1921); Griffin v. Schlenk, 139 Ky. 523, 102 S.W. 837 (1907); others emphasize the chilling of bidding by third persons, Strasner v. Carroll, 125 Ark. 34, 187 S.W. 1057 (1916); Broadwell v. Smith, supra; Holmes v. Holmes, 106 Ga. 858, 33 S.E. 216 (1899); and some comment on the inadequacy of the price paid by the bidder. Bogert, op. cit., Sec. 494. It has been established that a purchase at a judicial sale for an inadequate consideration will not of itself be grounds for a constructive trust, unless the inadequacy is gross. Marlatt v. Warwick, 18 N.J.Eq. 108 (1866). The sum of $179,000.00 paid by Banco Popular was an adequate consideration, and the fact that the property purchased could have greater value for Banco Popular due to its proximity to lands mortgaged in favor of Banco Popular, is not proof that the price paid by the Bank was inadequate. At the most, what Banco Popular did was to offer the property purchased conditioned upon the full payment of Las Colinas' debt, and of course,

this cannot be considered as a promise to hold the property in trust. Therefore, we hold that Banco Popular purchased the 196-cuerda parcel in a bona fide transaction and its title is not subject to any equitable or legal attack.

Judgment will therefore be entered in accordance herewith.