## SOUTH BRANCH LUMBER COMPANY *v.* OTT.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF IOWA.

No. 135. Argued December 18, 1891. — Decided January 18, 1892.

The question of the construction and effect of a statute of a State, regulating assignments for the benefit of creditors, is a question upon which the decisions of the highest court of the State, establishing a rule of property, are of controlling authority in the courts of the United States.

The decisions of the highest court of Iowa with regard to the statute of that State regulating such provisions now codified in section 2115 of the Code, hold: (1) that it does not prevent partial assignments with preferences, or sales or mortgages of any or all of the party's property in payment of or security for indebtedness; its operation being limited to the matter of general assignments: (2) that several instruments, executed by a debtor at about the same time, may be considered as parts of one transaction, and as in law forming but one instrument; and if, so construed, they have the effect of a general assignment with preferences, they are within the denunciation of the statute: (3) that although several instruments may be executed by the debtor at about the same time, they do not necessarily create one transaction, nor must they necessarily be considered as one instrument; but the decision of whether they do or not, and whether they come within the denunciation of the statute, or not, must depend, in each case, upon the character of the instruments, the circumstances of the case and the intent of the parties.

When the effect of invalidating such an assignment, without preferences on its face, by reason of previous preferential transactions claimed to be part of it, will be to let in to preference another creditor attaching after the assignment, the court will be justified in adhering to the letter of the statute, when the circumstances permit it.

THE court stated the case as follows:

On April 27, 1886, George Ott, one of the defendants, doing business at Davenport, Iowa, made a general assignment of

all his property, for the benefit of his creditors, to Charles F. Meyer. The next day complainant commenced its action at law in the District Court of Scott County, Iowa, against Ott, to recover $37,191.69, and caused a writ of attachment to be issued against the property of Ott. The writ was served by a levy upon certain real estate; and by the garnishment of Meyer, the assignee, and also of Charles Hill and Addie Kloppenberg, holders of chattel mortgages against Ott.[1] The action was removed by the plaintiff to the Circuit Court of the United States for the Southern District of Iowa, and thereafter proceeded to judgment on September 17, 1887, for $40,261.34. Shortly after such removal complainant commenced this suit, in aid of the action in attachment, by filing its bill in that court, the object of which was to have the assignment declared void, and a receiver appointed of the property. The debtor, Ott, his assignee, Meyer, the chattel mortgagees, Hill and Kloppenberg, and the guardian of the latter, were made parties defendant. Thereafter Meyer, the assignee, died, and in his place were substituted his successor, J. B. Meyer, and his executrix, Auguste Meyer. Answers were filed, proofs taken and at the June, 1887, term, a decree was entered sustaining the validity of the assignment, but adjudging the mortgage to Hill fraudulent as against complainant, and ordering that the assignee, out of the funds in his possession, pay to complainant the sum of $3225, the amount due on that chattel mortgage. From this decree the plaintiff has appealed to this court.

*Mr. Frank J. Smith* (with whom was *Mr. J. M. Flower* on the brief) for appellant.

The provision of the Iowa statutes under which it is claimed the assignment in controversy is void, is as follows: "No general assignment of property by an insolvent, or in contem-

---

[1] Both mortgages were executed and delivered February 20, 1886, and both were withheld from record until April 26. The one to Hill was to secure him as indorser. The one to Kloppenberg to secure his granddaughter, a minor, of whose estate he had been appointed guardian, and whose moneys he had taken into his business.

plation of insolvency, for the benefit of creditors, shall be valid, unless it be made for the benefit of all his creditors in proportion to the amount of their respective claims." Iowa Rev. Stats. sec. 2115, p. 569: tit. Of Assignments for Creditors. It is well settled by the general current of authority in Iowa, that where an insolvent debtor, in contemplation of making a voluntary assignment for the benefit of creditors, gives security to one or more of his creditors by separate instruments, followed by an assignment, all of said instruments will be construed together as an assignment with preferences and therefore void under the statute. *Cole* v. *Dealham, Garnishee*, 13 Iowa, 551; *Van Patten* v. *Burr*, 52 Iowa, 518; *Farwell* v. *Jones*, 63 Iowa, 316; *Perry* v. *Vezina*, 63 Iowa, 25; *Gage* v. *Parry*, 69 Iowa, 605.

Such being the rule, it becomes necessary to examine the facts, about which there is little dispute. The chief controversy is upon the time when Ott began to contemplate making an assignment. The facts bearing on it are briefly these. On April 12, Beidler, the appellant's secretary, had an interview with Ott. He had with him a statement of Ott's financial condition, which, in his opinion, showed insolvency, and which showed an enormous increase of liabilities over assets, as compared with his statement of the preceding year. At this meeting, Beidler insisted that the debt must be reduced, although it does not appear that he threatened suit, although the claim was so large and the circumstances were such that Ott might reasonably apprehend a vigorous effort to enforce collection in the near future, unless the amount was materially lessened. In the forenoon of April 26th Ott evidently felt that a crisis had been reached in his affairs, and consulted a lawyer for the first time so far as known, and from thence on was actively engaged in putting his affairs in order.

This is what he did on that day: (1) He told Peters, his attorney, to record the Kloppenberg mortgage, which had never been delivered, and it was filed for record at six minutes past five P.M. (2) He told Hill that he might have his mortgage, given to secure him as endorser, recorded, which was filed for record at seven minutes past five. (3) He directed his book-

keeper to make out and give to Christ. Mueller three drafts on customers for $1239.46 as collateral security for a debt owing to him, which drafts were delivered by the clerk. (4) He personally delivered to T. W. McClelland, for T. W. McClelland & Co., a draft upon one of his customers for $660.80, as collateral security for *a debt not then due*, with a statement that he was in trouble and did not propose to go back on his friends. On the morning of the 27th of April, at or about the time of executing the assignment, Ott, by an instrument in writing, drawn up by his attorney who drew the assignment, pledged four carloads of merchandise for the payment of a freight bill of $826.57. Whether this reached the freight agent before the assignment was recorded cannot be determined, but the security was recognized by the assignee and the debt paid.

All of these transactions were purely voluntary upon the part of Ott, as much so as the assignment itself. No compulsion was used or even threatened *by any* of the creditors who were preferred, to obtain these securities. It is vastly more reasonable to suppose that these preferences were given because Ott was contemplating a voluntary assignment than that the assignment was made because he had voluntarily given the preferences. The real question is, had Ott *in contemplation* the making of an assignment at the time of these transactions? and not whether he had made up his mind to do so.

Some men are so constituted that they do not regard their minds as made up so long as the opportunity to change their views remains, or until matters have proceeded so far that such change is impossible. Ott must have looked at the matter in this light, and for the purposes of this case concluded that his mind was made up when he had actually executed the assignment, and not before; for when he is asked whether the papers were being prepared on the afternoon of the 26th, he testifies simply to a belief that they were not, because he hadn't yet reached a conclusion; that is, made up his mind. The assignment itself, with its *three pages* of carefully prepared schedules of assets and liabilities, is a flat contradiction of and sufficient to discredit his testimony. So complete a list

of creditors, with a list of their addresses and the amounts due to each, could never have been prepared on the morning of the 27th of April so as to be filed before 9 o'clock.

The testimony of Ott as to his secret intent, wholly unsupported, inconsistent with itself and contradicted as to material matters, by the testimony of other witnesses, is entitled to no weight as against the irresistible conclusion to be drawn from the series of acts and transactions which preceded and culminated in a voluntary assignment within the space of twenty-four hours.

Some stress is laid by the learned judge who decided this case in the court below upon the inequitable result of holding the Ott assignment void, as it would give to the attachment creditors the entire estate. Undoubtedly it would be much more satisfactory to a court of equity, had the law provided that the preferences and not the assignment should be void. The fact that the penalty imposed by the legislature was a harsh one, and operated unjustly upon the right of others, seems to have been something of an obstacle in the way, in determining Ott's intent.

The inquiry is : do the facts and circumstances and the testimony show that Ott, by his various transactions and instruments, has made an assignment with preferences ? If he has done so, then all he has done is void by the terms of the statute. If the testimony is sufficient to justify that conclusion, when the law makes the preferences void, the same result must follow, though the law makes the assignment void.

*Mr. John C. Bills* for appellees.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The single question in this case is as to the validity of the assignment. Its invalidity is claimed under section 2115 of the Code of Iowa : "No general assignment by an insolvent, or in contemplation of insolvency, for the benefit of creditors, shall be valid unless it be made for the benefit of all his creditors in proportion to the amount of their respective claims."

Iowa Rev. Stats. 569.   This statute has been in force since 1851.   Code, 1851, § 977; Revision, 1860, § 1826.   The assignment in question, standing by itself presents no ground of challenge.   It purports to be a general assignment, is for the benefit of all creditors and contains no preferences; but the contention of plaintiff is, that, nearly cotemporaneously with it, were executed by Ott, the assignor, certain other instruments, which are to be taken as part of the one transaction, and by which preferences were given.   The object of the statute was to secure equality among creditors, an object which certainly has the merit of equity.   Curiously enough, counsel for plaintiff insists that this equity misled the Circuit Court, and protests against its like influence upon our judgment, while strenuously insisting upon such a construction of the transaction as will enable his client to obtain that preference which it was the purpose of the statute to prevent.   He says: " Some stress is laid by the learned judge who decided this case in the court below upon the inequitable result of holding the Ott assignment void, as it would give to the attachment creditors the entire estate.   Undoubtedly it would be much more satisfactory to a court of equity had the law provided that the preferences and not the assignment should be void.   The fact that the penalty imposed by the legislature was a harsh one, and operated unjustly upon the right of others, seems to have been something of an obstacle in the way, in determining Ott's intent."   But if we apply the letter alone of the statute, then he has no cause of complaint; for the assignment standing by itself is without preferences, and only an assignment with preferences is denounced.   Only by going beyond the letter and, in obedience to the spirit, inquiring whether antecedent instruments were not so related to the assignment as fairly to be taken as parts thereof, and constituting with it but one transaction, has the plaintiff any standing in court.   But shall we ignore the letter and heed the spirit to give a party a standing in court, and then ignore the spirit and heed only the letter in the further consideration of the case?

The rights of the parties are determined by this local statute, and the construction placed thereon by the Supreme Court of

the State is decisive. The question of the construction and effect of a statute of a State, regulating assignments for the benefit of creditors, is a question upon which the decisions of the highest court of the State, establishing a rule of property, are of controlling authority in the courts of the United States. *Brashear* v. *West*, 7 Pet. 608, 615; *Allen* v. *Massey*, 17 Wall. 351; *Lloyd* v. *Fulton*, 91 U. S. 479, 485; *Sumner* v. *Hicks*, 2 Black, 532, 534; *Jaffray* v. *McGehee*, 107 U. S. 361, 365; *Peters* v. *Bain*, 133 U. S. 670, 686; *Randolph* v. *Quidnick Co.*, 135 U. S. 457; *Chicago Union Bank* v. *Kansas City Bank*, 136 U. S. 223, 235.

This statute, which, as we have seen, has been in force in the State of Iowa for thirty years, has been repeatedly before its highest court. In the margin may be found a list of cases decided by that court, in which it has been the subject of construction.[1] These propositions seem to be established.

First, this section does not prevent partial assignments with preferences, or sales or mortgages of any or all of the party's property in payment of or security for indebtedness. Its operation is limited to the matter of general assignments, and does not destroy that *jus disponendi* which is an incident to title. *Cowles* v. *Ricketts*, 1 Iowa, 582; *Fromme* v. *Jones*, 13 Iowa, 474; *Lampson* v. *Arnold*, 19 Iowa, 479, 486. In this

---

[1] *Cowles & Co.* v. *Rickets*, 1 Iowa, 582; *Meeker* v. *Sanders*, 6 Iowa, 61; *Burrows* v. *Lehndorff*, 8 Iowa, 96; *Johnson* v. *McGrew*, 11 Iowa, 151; *Fromme* v. *Jones*, 13 Iowa, 474; *Cole* v. *Dealham*, 13 Iowa, 551; *Graves* v. *Alden*, 13 Iowa, 573; *Buell* v. *Buckingham & Co.*, 16 Iowa, 284; *Hutchinson & Co.* v. *Watkins*, 17 Iowa, 475; *Ruble* v. *McDonald*, 18 Iowa, 493; *Lampson & Powers* v. *Arnold*, 19 Iowa, 479; *Lyon* v. *McIlvaine*, 24 Iowa, 9; *Davis & Co.* v. *Gibbon*, 24 Iowa, 257, 263; *Farwell & Co.* v. *Howard & Co.*, 26 Iowa, 381; *Van Patten & Marks* v. *Burr*, 52 Iowa, 518; *Van Patten & Marks* v. *Burr*, 55 Iowa, 224; *Kohn Bros.* v. *Clement, Morton & Co.*, 58 Iowa, 589; *Van Horn* v. *Smith*, 59 Iowa, 142; *Perry* v. *Vezina*, 63 Iowa, 25; *Farwell* v. *Jones*, 63 Iowa, 316; *Jaffray & Co.* v. *Greenbaum*, 64 Iowa, 492; *Cadwell's Bank* v. *Crittenden*, 66 Iowa, 237; *Carson et al.* v. *Byers et al.*, 67 Iowa, 606; *Gage & Co.* v. *Parry*, 69 Iowa, 605; *Garrett* v. *The Burlington Plow Co.*, 70 Iowa, 697; *Aulman* v. *Aulman*, 71 Iowa, 124; *Van Patten & Marks* v. *Thompson*, 73 Iowa, 103; *Bolles* v. *Creighton*, 73 Iowa, 199; *Loomis & Son* v. *Stewart*, 75 Iowa, 387; *King* v. *Gustafson*, 80 Iowa, 207; *Bradley* v. *Bischel*, 46 N. W. Rep. 755.

latter case the court enters into a full consideration of the import of the statute, and says : " This statute, it will be observed, does not limit or affect the right of an insolvent debtor, or one contemplating insolvency, or indeed, any other, to sell or mortgage a part or all of his property to one or more of his many creditors, in payment or security of a particular debt or debts.   And this is true, although such sale or mortgage may, practically, defeat all other creditors than the grantee, from collecting their demands.   Nor does the statute prohibit or interfere with the right of any debtor, as it existed prior to the statute, to make a partial assignment.   In other words, the statute does not expressly, or by implication, extend any further, or apply to any instrument or conveyance, other than to a general assignment.   *Bock* v. *Perkins*, 139 U. S. 628, 641. And, therefore, it is still competent for any debtor to pay a part of his creditors in full ; to secure another part by mortgage, or deed of trust upon a part of his property ; to make a partial assignment of still other property for the benefit of certain other creditors, with or without preference, and afterwards to make a general assignment.   The statute simply provides that such general assignment shall not be valid, unless it is made for the benefit of all the creditors *pro rata.*"

Second, several instruments executed by a debtor, at about the same time, may be considered as parts of one transaction, and in law forming but one instrument ; and if, as thus construed, they have the effect of a general assignment with preferences, they are within the denunciation of the statute. *Burrows* v. *Lehndorff*, 8 Iowa, 96 ; *Cole* v. *Dealham*, 13 Iowa, 551 ; *Van Patten* v. *Burr*, 52 Iowa, 518.

And, third, that although several instruments may be executed by the debtor at about the same time, they do not necessarily create one transaction or are to be considered as one instrument ; and whether they do or not, and whether they come within the denunciation of the statute, depend upon the character of the instruments, the circumstances of the case and the intent of the parties.   *Lampson* v. *Arnold*, 19 Iowa, 479 ; *Van Patten* v. *Burr*, 55 Iowa, 224 ; *Perry* v. *Vezina*, 63 Iowa, 25 ; *Gage* v. *Parry*, 69 Iowa, 605 ; *Garrett* v. *Plow*

*Company*, 70 Iowa, 697; *Bolles* v. *Creighton*, 73 Iowa, 199; *Loomis* v. *Stewart*, 75 Iowa, 387.

The case of *Van Patten* v. *Burr*, in 52 and 55 Iowa, is instructive. In that case the debtor, being insolvent, had executed two chattel mortgages and an assignment, all bearing date November 30, 1878. When first presented to the Supreme Court it came on demurrer to the petition, in which it was alleged that the debtor, " in contemplation of insolvency, and being then insolvent, made, executed and delivered in writing a general assignment of his property for the benefit of his creditors, contained in three instruments executed by him," etc.; and, also, " that said instruments were intended to and do constitute as a whole a general assignment of his property for the benefit of creditors." And it was held, under such allegations, that the three instruments were to be treated as one, and together making a general assignment with preferences. The case went back for trial, and upon the testimony it appeared that one of the mortgages was accepted by the mortgagee without any knowledge of the contemplated assignment; and in 55 Iowa it was held that such mortgage was good.

In *Perry* v. *Vezina*, 63 Iowa, 25, it appeared that a chattel mortgage was executed about three hours before a general assignment; but as it was agreed that, when the mortgage was made, the debtor did not contemplate making the assignment, the latter was held valid. The court said : " But, to justify a court in finding that a mortgage may be taken in connection with some other instrument as constituting an assignment, it should appear that the mortgagor, at the time he made the mortgage, had the intention to make an assignment." Similar expressions are found in others of the cases cited. Obviously, it is a fair inference from these decisions that, as well said by Judge Love in deciding this case, " the intention of the assignor must be the true and guiding principle of decision." With what intent did Ott in this case execute the various instruments prior to the general assignment? Was he intending a general assignment, and seeking to evade the statute, and to give preferences by other instru-

ments? or was he, finding himself involved and likely to be closed out by some of his creditors, simply preferring some, uncertain as to what disposition he should make of the balance of his property after they had been secured ?

Upon the basis of these rulings interpreting the scope and effect of this statute, we perceive no error in the conclusions of the Circuit Court. Quite an amount of testimony was offered, for the purpose of showing that the debt of the appellant was fraudulently contracted by Ott. The assumption seems to be, that if this be proved it follows that the assignment was made in violation of the statute, and void; but there is no sequence in these propositions. Even if it were established beyond doubt that Ott, with deliberate purpose to defraud the appellant, contracted this debt, this would not determine the scope or effect of his assignment. It were as reasonable to suppose that, having made the personal gain he designed, his interest ceased, and that he never contemplated an assignment until the very moment of its execution. Indeed, if he were guilty of fraud, in the first instance, it would imply a state of mind indifferent to all results after the primary purpose of his own profit had been secured.

It would be unjust, however, to the parties to leave this statement with the inference which might follow, that we consider it established that the debt was fraudulently contracted. The basis of the contention in this respect is in the inaccurate statements furnished by Ott to appellant in reference to his financial condition during the years prior to this assignment. Obviously they were so as to values; but as he named the property, his overestimate of value is not to be adjudged necessarily fraudulent. We note one matter upon which stress is laid : a quarry, valued by him at $14,000. Notwithstanding the testimony as to its utter worthlessness, yet he had invested large sums in trying to develop and work it, and was not without hopes of ultimately realizing much from it. He named this quarry as a part of his assets, and gave his estimate of its value. If the lumber company desired further information as to its location, its condition and its prospects, it could have asked of him, or made itself an independent in-

vestigation.    If it was content with his statement, it must show not merely that he had overestimated, but, further, that he had fraudulently given the value.    He furnished to the lumber company the data for investigation, and while *caveat emptor* is the rule as to the thing sold, *caveat venditor* is also the rule as to the pecuniary condition and solvency of the purchaser.    Something more than overestimate of value on the purchaser's part is necessary before it can be said that on this account the debt was fraudulently contracted.    A deliberate overestimate and an intention to defraud are essential.

But we do not care to tarry upon this feature of the case. The business relations between the lumber company and Ott had been running for a series of years.    He had purchased from it to an amount exceeding $180,000.    His business had averaged about $300,000 a year.    His statements, while inaccurate and overestimated as to values, disclosed the property which he possessed, and enabled the lumber company to investigate.    But whatever may have been the character of the relations between the lumber company and him, the inquiry before us is limited to the assignment; and here five matters are referred to and claimed by the appellant to be so related to it as to be in fact part and parcel of it, and thus together constituting a general assignment with preferences, within the denunciation of the statute.    Two of them are chattel mortgages, executed on the 20th day of February, 1886, more than two months before the assignment; one to Charles Hill and the other to Addie Kloppenberg.    That these were executed without any thought of an assignment is clear.    At the time there was no threatened interference and no apparent danger of trouble to Ott in his business.    The one to Hill was to secure him as an indorser.    It is true, that while executed on February 20 and delivered to Hill, it was not recorded until the day before the assignment; and this failure to record was upon an agreement made by Hill with Ott for fear that such record would precipitate an attack upon the latter by his creditors.    On this account it was adjudged void by the Circuit Court, a question which we cannot consider, as, the amount of the mortgage being less than five thousand dollars, Hill could bring no ap-

peal to this court. But this stipulated agreement not to record, while it may have vitiated the mortgage, in no manner affected the assignment made long after, and for the reason that when the one was executed there was no thought or intent on the part of Ott of the other. The same may be said of the mortgage to Addie Kloppenberg. She was a minor, a girl of about fourteen years of age, his granddaughter, of whose estate he had been appointed guardian, and whose moneys he had taken into his business. Security for these moneys he had been directed by the Probate Court, having charge of her estate, to give. Instead of real estate security he gave this chattel mortgage, and placed it in the hands of the attorney who was looking after the business of the estate, with a like suggestion not to record, and it was not in fact recorded until the day before the assignment. That he had this amount belonging to this minor in his possession is not questioned; that he gave the mortgage under the direction of the Probate Court is not disputed; and that he gave the same long before the closing out of his business was thought of is clear. Of course, it was not part of the assignment.

With respect to the three other matters, there is more of a question. It appears that on the 12th of April, on receipt of a statement of account, Francis Beidler, the representative of the appellant, came to Davenport to investigate the situation. The outcome of that investigation was not satisfactory. A demand was made for a reduction of the indebtedness. The plain import of the interview was that things could not continue as they had been. Two or three days before the assignment the bank with which Ott had been doing business for a series of years, and which had been discounting his drafts before acceptance, and which was at such time carrying about $11,000 of such drafts, intimated that it must have acceptances before discounting. His son, who was his principal salesman, his only travelling man, returned from one of his trips. While ordinarily selling from $18,000 to $20,000, his sales on that trip had practically amounted to nothing. Strikes in the Southwest were significant of labor troubles, and shadowed the business outlook. With these accumulating facts, evidently

Ott began to think that the end of his business career, at least so far as his present undertakings were concerned, was at hand. On the day before the assignment he gave to one Mueller, to whom he owed about $9000, drafts on his customers for goods sold to the amount of $1239.46. On the same day he gave to McClelland & Co., to apply on a debt of $900, a like draft to the amount of $660.80; and on the very morning of the assignment he sent a letter to George F. White, the agent of the railroad company, notifying him that he might hold four carloads of glass, then in the possession and on the tracks of the railroad company, as security for a balance of between eight and nine hundred dollars of freight due.

Now, these transactions were but shortly prior to the assignment. They were in a general sense contemporaneous with it. They took place when Ott was conscious of the impending danger of the closing out of his business, and they operated as preferences to these creditors. They were so nearly related in time to the assignment, and made under such circumstances, that if in an action at law and under proper instructions the question had been submitted to a jury whether they were made with a view to an assignment, and to evade the statute, and the verdict had been in the affirmative, it would be difficult to say that such verdict was not warranted by the testimony. All this may be, must be, conceded; yet over against it are these matters : The positive testimony of Ott, that when he gave these drafts to Mueller and McClelland, he had not determined upon an assignment. He knew that he was in financial trouble, and considered himself under special obligations as to one at least of these debts. His purpose was simply payment, and that he had a right to make. He supposed he should have to stop business, but in what manner the close should be brought about, whether by the action of creditors or his own voluntary transfer, was undetermined. He was waiting and considering, and only decided upon an assignment on the morning of the 27th. If such was the fact, then, within the rules laid down by the Supreme Court of Iowa, these preferences are not to be taken as part and parcel of the assignment, or as vitiating it.

In reference to the letter from Ott to White, with respect to holding the four carloads of glass as security for freights, it is clear that this was only putting in writing an agreement made long before.   For the testimony of White and Ott both show, and to their testimony there is no contradiction, that White, months before, had again and again urged prompt payment of freights, and that Ott had agreed to always leave on the track goods enough to secure any amount of freight that might be due.   The prior agreement, though oral, was valid; and the letter was not a new contract, giving then a preference, but only a written expression of that which had theretofore been agreed upon, and agreed upon when there was no thought of an assignment.   This brings the transaction within the reasoning of this court in the case of *Hauselt* v. *Harrison*, 105 U. S. 401, in which, as against the claims of an assignee in bankruptcy, a transfer made immediately before the adjudication in bankruptcy was held to relate back and to carry into effect an agreement entered into long before, and, therefore, not to be vitiated by the bankruptcy proceedings.

Further, it may be stated, as sustaining the conclusions of the Circuit Court, that the payments made by Ott during the few days before and up to the very time of the assignment were not extraordinary, not differing from the usual course of his business in prior months.   McClelland's and Mueller's were only partial payments, and made in consequence of repeated requests, so that he was not hastening unnecessarily to pay or secure them.   And, further, though there was a mortgage on his homestead which he might have paid off, though there was money in the bank which he might have withdrawn and pocketed, he did neither; nor did he act as though intending an assignment, or seeking to benefit himself as much as possible prior thereto.   His conduct seems to have been in the utmost good faith; and while these drafts did operate to secure these creditors a portion of their claims, yet they were not given under such circumstances that the court must conclude that they were in anticipation of an assignment; or find that he was guilty of untruth in his testimony, that, when he made

them he had not decided what to do. As intimated, the testimony in reference to these last matters does not leave the case free from doubt, yet we are of the opinion that the Circuit Court rightly read it, and properly held that it was not shown that at the date of those instruments Ott had determined upon an assignment. They were, therefore, valid as in the exercise by him of his undoubted *jus disponendi;* and the assignment, subsequently determined upon and subsequently made, was without preferences, was not void under the statute of Iowa, but was a valid general assignment, transferring all of the property then in his possession for the benefit of all his creditors.

The decree will be

*Affirmed.*