**WILKIN ELEVATOR d/b/a Lowden Feed Service, Appellant,**

v.

**BENNETT STATE BANK, Appellee.**

**No. 93–119.**

Supreme Court of Iowa.

Sept. 21, 1994.

Bradley L. Norton and William B. Norton, Lowden, for appellant.

David J. Meloy, Muscatine, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, NEUMAN and ANDREASEN, JJ.

CARTER, Justice.

Appellant, Wilkin Elevator d/b/a Lowden Feed Service (the feed store), appeals from an adverse judgment in its action for money damages against the appellee, Bennett State Bank (the bank). The action alleged that the bank breached an agreement to assure full payment to the feed store of the account of its customers Doug and Judy Beuthien (the Beuthiens). The feed store also sought to recover damages from the bank on theories of tortious interference with an existing contract between itself and the Beuthiens, an alleged improper transfer of assets from the Beuthiens to the bank, and an alleged superi-

or claim to the proceeds of checks held by the bank and made payable jointly to the Beuthiens, the feed store, and the bank.

The district court granted summary judgment in favor of the bank on the claims of tortious interference with the contract, improper transfer of assets, and waiver of the bank's lien rights (one of the issues in the contest over the proceeds of the joint payee checks). The contract claims were tried to a jury. At the conclusion of the evidence, the district court directed a verdict in favor of the bank on those claims.

The court of appeals affirmed the directed verdict on the contract claims but reversed the district court's grant of summary judgment on the other claims. It remanded those claims to the district court for further proceedings. We granted further review. After reviewing the record and considering the arguments of the parties, we vacate the decision of the court of appeals and affirm the judgment of the district court.

The Beuthiens carried on a large hog operation, commencing prior to 1980 and continuing until October 1991. During this time, most of their financing was obtained from the bank. In 1980, the Beuthiens signed an agricultural security agreement, which gave the bank a security interest in all of their livestock and the proceeds from the sale thereof. This security agreement was amended in 1987 to fulfill the requirements of Iowa Code section 554.9307 (1991), which provides that a lender must give notice to potential buyers of farm products in order to maintain a lien. The bank filed financing statements on these security agreements in 1984 and again in 1989.

The feed store began selling hog feed to the Beuthiens early in 1989. It was a local dealer for Golden Sun Feeds. Golden Sun representatives made most of the contacts with the Beuthiens concerning this account. Golden Sun offered financing arrangements to the Beuthiens with respect to their purchases from the feed store. The feed store was the seller of the feed, however, and guaranteed payment of the Beuthiens' notes to Golden Sun.

In January 1987, the Beuthiens delivered to the bank a written list of the potential buyers of their hogs. The bank sent out notices to those potential buyers on January 23, 1987; May 5, 1989; and August 13, 1991. With respect to feed sold under Golden Sun financing, the Beuthiens paid all obligations occurring prior to March 22, 1991. Those payments were ordinarily made promptly upon the sale of the hogs for which the feed was used.

In December 1990, the credit manager for Golden Sun became concerned that the volume of credit sales to the Beuthiens was becoming increasingly large. At that time, he spoke with the president of the bank about the Beuthiens' financial situation. He testified at the trial that the bank president advised him that he was monitoring the Beuthiens' financial situation very closely. He stated that they were having problems with their sows and were converting to a strictly feeder pig operation. The bank president told the credit manager that "he would insist that when [the Beuthiens] sell hogs that the feed bill would get paid." The manager of the feed store testified at the trial that the Golden Sun credit manager told him of the substance of this conversation.

A March 22, 1991 financing arrangement with Golden Sun for feed purchased by the Beuthiens in the amount of $2139.78 was due on July 31, 1991. The Beuthiens sold $16,877.60 worth of hogs in July 1991 and deposited most of that sum in their account at the bank. On July 31, 1991, they wrote a check in payment of the March 22, 1991 obligation to Golden Sun. They believed that they had funds on deposit in the bank to cover that check. It was returned unsatisfied, however, as a result of the bank exercising setoff rights on the account to satisfy a portion of the Beuthiens' indebtedness to it.

On September 6, 1991, the Beuthiens commenced doing business with another feed supplier, which, as a condition for doing business with them, obtained a subordination agreement from the bank as to the Beuthiens' account. On October 25, 1991, the Beuthiens entered into an agreement with the bank wherein substantial assets, including most of their hogs, were transferred to the bank as satisfaction for all sums owed to that financial institution. The fair market value of these assets was substantially less than the total indebtedness.

On November 15, 1991, the Beuthiens paid the obligation evidenced by the dishonored July 31, 1991 check tendered for the March 22, 1991 financing agreement with Golden Sun. Other financing agreements with Golden Sun made subsequent to March 22, 1991, and totaling $12,233.42, have not been paid by the Beuthiens, and the feed store was required to indemnify Golden Sun for that indebtedness. In addition, the feed store personally financed another $7099.05 indebtedness of the Beuthiens for feed and farm supplies not covered by Golden Sun financing arrangements. These amounts also remain unpaid. The Beuthiens have discharged their obligations to the feed store through federal bankruptcy proceedings.

At the time the present action was commenced, two joint payee checks were outstanding that had been issued by purchasers of the Beuthiens' hogs. One of these checks in the amount of $7700.31 was dated October 18, 1991. The other check in the amount of $6862.18 was dated October 22, 1991. Both of these checks were payable jointly to the Beuthiens, the bank, and the feed store. In its disposition of the other issues in the litigation, the district court determined that the bank was entitled to the money evidenced by these two instruments. Other facts that bear on the issues will be detailed in our discussion of the legal arguments that have been presented.

### I. *The Breach-of-Contract Claims.*

■ The court of appeals ruled adversely to the feed store on the breach-of-contract claims. We have reviewed that court's conclusions upholding a directed verdict on this portion of the case and find that it was correct.

The breach-of-contract claims turned on the December 1990 conversation between the bank and the Golden Sun credit manager. At this time, the Golden Sun credit manager was seeking information on behalf of his own company. He was not acting as an agent of

the feed store. The credit manager testified at trial that he did not interpret the statement made to him by the bank president as a guarantee of the Beuthiens' feed obligation or a subordination of the bank's claim against the Beuthiens. Under these circumstances the feed store, which only obtained a second-hand account of this conversation, was entitled to no higher expectations than the party to whom the statements were made. There is no basis for finding either an express or implied contract guaranteeing payment of the account by the bank.

■ A verdict was also properly directed on the feed store's companion claim of equitable estoppel. In order to sustain that type of claim, the party asserting it must show that the statement relied on was false or misleading and, in addition, show that it was made with the intent that it be relied on. *Davidson v. Van Lengen*, 266 N.W.2d 436, 441 (Iowa 1978). In the present case, the evidence was insufficient to permit an affirmative finding on either of these requirements.

## II. *Claim of Improper Transfer of Assets.*

■ The feed store has asserted that the transfer of assets to the bank by the Beuthiens on October 25, 1991, was improper on two grounds: it was made in violation of Iowa Code section 681.1 (1991), and it was a fraudulent transfer. Both the district court and the court of appeals found that chapter 681 in no way aids the feed store. We agree.

The feed store urges that, because less than all of the Beuthiens' assets were transferred to the bank, the transfer is void as an improper assignment for the benefit of creditors under section 681.1. We believe that any invalidity of the transfer for purposes of chapter 681 is of no consequence in this litigation. If a transfer does not satisfy the requirements of chapter 681, that would only render the transaction invalid for purposes of invoking the protection afforded under those statutes.[1] No party to the present transaction is seeking to invoke the protections of chapter 681 in any manner.

■ With respect to the feed store's claim that the transfer of assets to the bank was fraudulent, the court of appeals held that summary judgment was improperly granted on this claim because of a genuine issue of material fact appearing in the motion papers. We disagree. Although the transfer may have been preferential as to one creditor over another, that is not a basis for voiding it if a fair consideration was received. *Rouse v. Rouse*, 174 N.W.2d 660, 669 (Iowa 1970); *Steffy v. Schultz*, 215 Iowa 831, 842–43, 246 N.W. 907, 910 (1933). The relinquishment of an indebtedness may be a fair consideration and, in the present case, the indebtedness relinquished exceeded the market value of the assets that were transferred. The district court properly granted summary judgment on this portion of the case.[2]

## III. *The Tortious–Interference Claim.*

■ The court of appeals concluded that there was a genuine issue of material fact concerning whether the bank intentionally

---

1. This issue is very similar to the one presented to the Supreme Court in *South Branch Lumber Co. v. Ott*, 142 U.S. 622, 12 S.Ct. 318, 35 L.Ed. 1136 (1892). The Court in interpreting the Iowa statutes pertaining to assignments for the benefit of creditors observed:

     This statute, it will be observed, does not limit or affect the right of an insolvent debtor, or one contemplating insolvency, or, indeed, any other, to sell or mortgage a part or all of his property to one or more of his many creditors, in payment or security of a particular debt or debts. And this is true, although such sale or mortgage may, practically, defeat all other creditors than the grantee, from collecting their demands. Nor does the statute prohibit or interfere with the right of any debtor, as it

existed prior to the statute, to make a partial assignment. In other words, the statute does not expressly, or by implication, extend any further, or apply to any instrument or conveyance, other than to a general assignment. *Id.* at 629, 12 S.Ct. at 321, 35 L.Ed. at 1139.

2. In deciding the issue involving the alleged fraudulent transfer on the merits, we do not imply that the feed store has standing to advance such a claim. Ordinarily, a mere general creditor has no interest that can be asserted against property of a debtor who has sold or assigned same to a third party. *See Lambert v. Reisman Co.*, 207 Iowa 711, 718, 223 N.W. 541, 545 (1929); *Klay v. McKellar*, 122 Iowa 163, 166, 97 N.W. 1091, 1092 (1904).

and improperly interfered with the feed purchase contracts existing between the Beuthiens and the feed store. It thus reversed the district court's contrary finding. We conclude that the district court's ruling was well founded and should not have been disturbed on appeal.

We have recognized that, in order to be actionable as a tort, intentional interference with an existing contract between other persons must be improper. *Jackson v. State Bank of Wapello,* 488 N.W.2d 151, 157 (Iowa 1992). In *Nesler v. Fisher & Co.,* 452 N.W.2d 191 (Iowa 1990), we determined that to establish improper interference a showing is required that the actor's predominant purpose was to injure or destroy the plaintiff's business. *Id.* at 199.

In the present case, we have already determined that the bank was not contractually obligated to subordinate its interests to those of the feed store. It appears that in dealing with the Beuthiens the bank was only acting to protect its own financial interests. Even when the summary judgment papers are viewed most favorably to the Beuthiens, as they must be, there is no evidence that would permit a rational finder of fact to conclude that the bank's predominant purpose was to injure or destroy the feed store. Support for our conclusions in this regard is found in *Jackson,* 488 N.W.2d at 157, and *Preferred Marketing Associates v. Hawkeye National Life Insurance Co.,* 452 N.W.2d 389, 396 (Iowa 1990), both of which determined that a party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests.

■ The feed store urges that the bank's legal entitlement to proceed against the Beuthiens' assets had been compromised. It argues that the bank approved a course of dealing in which the Beuthiens were allowed to sell their hogs free and clear of the bank's lien without prior approval. Thus, the feed store argues, the lien had been waived under

principles recognized in *Hedrick Savings Bank v. Myers,* 229 N.W.2d 252, 256 (Iowa 1975), and *Ottumwa Production Credit Association v. Heinhold Hog Market,* 340 N.W.2d 801, 803 (Iowa App.1983).

■ The feed store's argument is without merit. The cases upon which it relies were concerned with whether a secured party's lien continues to exist on collateral that the debtor has sold to a third party. In sharp contrast, the present case is one in which ownership of the security was transferred to the secured creditor in settlement of the secured obligation. This was done by agreement between the debtor and the secured creditor. As a result of the Beuthiens' default on obligations owed to the bank, the latter could have achieved a similar result acting unilaterally. *See* Iowa Code §§ 554.-9503, .9504, .9505 (1989). Because the feed store at no time had any lien on the Beuthiens' hogs or any of the other assets that were transferred to the bank, it has no basis to challenge the bank's action with respect to the collateral.[3]

### IV. *Entitlement to Proceeds of Joint Payee Checks.*

■ The final issue that we must consider is whether the district court correctly disposed of the proceeds of the two checks payable jointly to the Beuthiens, the bank, and the feed store. The district court ordered that the proceeds should go to the bank. The court of appeals disagreed and held that this determination should abide the result of further proceedings after denial of summary judgment.

Both of these checks were issued by third persons who purchased hogs from the Beuthiens. The feed store again relies on the argument that the bank's lien rights had been compromised by a course of dealing allowing hog sales to take place. Again, we conclude that the *Hedrick Savings Bank* and *Ottumwa Production Credit Association* cases relied on by the feed store have no

---

**3.** The feed store never tried to obtain a security interest on the Beuthiens' livestock or other assets until August of 1991, when it attempted to perfect a lien under the provisions of Iowa Code § 570A.3 (1991). Any lien under that statute was ineffective as against the bank, however, because of the feed store's failure to provide the bank with the required documentation. Iowa Code § 570A.2(3) (1991).

application. We are not concerned, as was the court in those cases, with whether the lien continued on the hogs in the hands of the buyer. We are concerned with the bank's lien on the proceeds of the hog sales. That lien was in no way compromised by a course of dealing, and by virtue of its existence, the bank holds a superior claim to the proceeds over the feed store, which had no lien on any of the Beuthiens' assets.

The fact that the two hog buyers elected to put the feed store's name on these checks does not alter the rights of the parties to the litigation. Only if the hog buyers had some personal basis for asserting that a portion of the proceeds should go to the feed store, and asserted that claim, would the feed store's claim rise to the level of the bank's claim. No such reason has been asserted in this litigation. We conclude that the bank has the superior claim to the proceeds of the two checks. This claim was expressly preserved in the October 25, 1991 settlement agreement with the Beuthiens.

We have considered all issues presented and conclude that the decision of the court of appeals should be vacated. The judgment of the district court is affirmed in all respects.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**