Nos. 95-3821/3929

Rail Intermodal Specialists,          *
Inc., an Iowa Corporation             *
formerly known as CC&P                *
Intermodal Corporation,               *
                                      *
     Appellee/Cross-Appellant,        *
                                      * Appeal from the United States
          v.                          * District Court for the
                                      * Northern District of
                                      * Iowa.
General Electric Capital              *
Corporation, a New York               *
Corporation formerly known            *
as General Electric Credit            *
Corporation,                          *
                                      *
     Appellant/Cross-Appellee.        *


Submitted:  June 10, 1996

Filed:  December 23, 1996


Before RICHARD S. ARNOLD, Chief Judge, MORRIS SHEPPARD ARNOLD, Circuit Judge, and ROSENBAUM,[1] District Judge.


MORRIS SHEPPARD ARNOLD, Circuit Judge.

     General Electric Capital Corporation ("GECC") appeals from a judgment entered against it in an action brought by Rail Intermodal Specialists ("Intermodal") for intentional interference with an existing contract.  GECC asserts that it was entitled to judgment as a matter of law and asks, in the alternative, for a new trial due to errors in the district court's instructions to the jury.

---

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

Intermodal cross-appeals from certain evidentiary rulings. The case, here under our diversity jurisdiction, is governed by Iowa law. Because we believe that GECC was entitled to judgment as a matter of law and that the cross-appeal is without merit, we reverse the judgment of the district court.

## I.

The contract at issue in this case was between Intermodal and a small railroad company called the Chicago Central and Pacific Railroad ("CC&P"). CC&P came into existence in December of 1985 when GECC lent John E. Haley $75 million to purchase a rail line from the Illinois Central Gulf Railroad. Mr. Haley, whose primary work experience was in real estate and property management, had first ventured into the railroad business the year before when he bought the Cedar Valley Railroad, also from the Illinois Central Gulf Railroad.

Intermodal is a company that brokers the placement of trucks on flatbed railroad cars. The business moves goods by a combination of trucking and railroad more cheaply than can be done by either mode by itself. Thomas Hastings, president of Intermodal, learned of the impending sale of the railroad to Mr. Haley through the newspaper, and called him to talk about the possibility of having Intermodal traffic on CC&P. An agreement between the two companies followed in December of 1985.

The contract at issue here was not the original one but one signed the following year. While under the first contract Intermodal paid an amount directly proportional to the volume of traffic it ran, under the second contract Intermodal paid a fixed amount of $6,106 a day for a train dedicated only to Intermodal's traffic. Under this second contract the revenue to the railroad was therefore the same whether Intermodal ran one car or a large train. Mr. Haley testified that he liked the new arrangement

because it relieved him of his concern about not covering his overhead during days when there were only a few Intermodal cars. Intermodal, for its part, felt that the contract was potentially more profitable. The contract contained a provision that allowed the parties to negotiate a new rate every three months to ensure that the contract remained "profitable for both parties."

CC&P, under Mr. Haley's stewardship, did not fare well. Within two years, it had become the paradigm of a business very much in distress: It had a severe cash flow problem; its accounts payable were overdue by several hundred thousand dollars; it was unable to make or adhere to financial projections; and its important personnel were leaving. The business had persistently failed to meet the financial performance targets set out in the loan agreement. By July, 1987, it was losing over $1 million a month. By that time loan payments had stopped, placing the business in default to GECC.

By September of 1987, GECC had acted on its prerogative under the loan agreement to audit the business. The audit report indicated that $8 million to $10 million would be needed to cover the cash-flow shortfalls expected to occur in the ensuing four months. The auditors, noting that the railroad's business comprised three parts -- coal delivery (called the "lifeblood" of the business), grain delivery, and Intermodal traffic -- found serious problems with the coal business. They were impressed with recent increases in revenues from grain shipments. As far as Intermodal business was concerned, although volume had recently risen, real revenue growth had been minimal because of the flat-rate contract with Intermodal; and the auditors concluded that "a lot of CCP marketing effort [was] expended in this minimally profitable area."

GECC came to believe that CC&P's fundamental difficulty was a lack of effective management: One auditor noted that "CCP appears to be a business without a management system infrastructure"; another auditor noted that he had a "[t]otal lack of confidence in operating management." GECC therefore acted to remove Mr. Haley from his position as president of CC&P. A deal was eventually struck and Mr. Haley left the railroad with a settlement. Don Wood, an independent consultant who had been hired by GECC to look into the railroad's operation, was installed as the new chief executive officer. Mr. Wood's compensation was set out in an employment contract with CC&P negotiated between him and GECC, which controlled CC&P's corporate board. In addition, as one GECC executive testified, there was an understanding that the stock which GECC had received from Mr. Haley would go to Mr. Wood "if he did something" with regard to the railroad.

Mr. Wood acted immediately to try to stem the sizable losses from which the business was suffering, and one object of his attention was the Intermodal contract. Andrew Lloyd, a GECC employee who was responsible for monitoring the railroad's loan, had reviewed the contract and scribbled some notes in the margin of the contract, including one exhorting someone to "do this now" next to the provision allowing for periodic readjustments of the price charged to Intermodal. Mr. Wood made his own notes on the same contract and later met with Intermodal officials to discuss adjusting the contract pricing. There was disagreement as to what the contract allowed, mainly with respect to whether, as Intermodal insisted, the permissible adjustments to the price were limited to increases of direct variable costs.

More meetings were planned, but in the meantime Mr. Wood sent a letter to Intermodal; the contents of this letter are not in dispute, but its meaning very much is. The letter stated that "[i]n order to restore this service to profitability the Daily

Train Charge ... will be $16,424 per day," almost three times the existing price. The letter, as an alternative, offered a consolidated service to Intermodal that represented a similar increase in costs, and closed with a request for an immediate response from Intermodal. According to Mr. Wood and GECC, this letter represented an attempt to negotiate adjustments in the pricing of the contract in order to make the contract profitable for the railroad. Intermodal, which says that the new pricing would have forced it out of business, contends that the letter itself constituted a breach of the contract.

After the letter was sent, negotiations between the railroad and Intermodal broke down. Intermodal halted all payments of any kind to the railroad, although it did continue to use the railroad's service. The railroad then filed suit against Intermodal seeking payment of nearly $1 million; Intermodal counterclaimed against the railroad for breach of contract. The parties resolved the lawsuit by executing a mutual release, with no money changing hands, several months later.

## II.

Iowa's law on the tort of interference with contract adheres closely to the principles outlined in the Restatement (Second) of Torts § 766 (1979). Under those principles, Intermodal had the burden to prove not only that the contract was breached, but also that the breach was intentionally induced by GECC. Intermodal was obligated to show, in addition, that GECC's conduct was improper. For the reasons that follow, we hold that there was insufficient evidence from which a reasonable jury could have inferred that GECC induced a breach of contract, assuming that there was one, or that GECC's conduct was improper. We therefore have no occasion to decide whether there was sufficient evidence to infer a material breach of contract.

A.

Intermodal's argument that GECC intentionally induced a breach of the relevant contract rests heavily on Mr. Lloyd's note written in the margin next to the adjustment provision of the contract, which simply directed someone to "do this now." In addition, Intermodal makes much of the fact that Mr. Wood had strong ties to GECC, and that stock in the railroad was held out to him by GECC as compensation "if he did something" with the railroad.

First of all, it is difficult to see how the direction to "do this now" could have been anything other than an exhortation to someone to take advantage of the adjustment provision in the contract and to renegotiate the contract in order to place it on a profitable footing. This seems to us the only reasonable inference that the marginal note can support. Similarly, the sole reasonable inference to be drawn from the comment that Mr. Wood would earn the stock held out to him only "if he did something" has to be that he had to succeed in the process of turning the railroad around generally. To infer that by providing an incentive to Mr. Wood GECC was prompting him to breach the contract with Intermodal is unreasonable.

It is important to see that Mr. Wood's interests were the same as GECC's interests: Each wanted the railroad to survive, because upon that outcome depended both GECC's hopes of salvaging its investment and Mr. Wood's hopes of being well compensated (the stock, of course, would be worthless if the business failed). Mr. Wood's actions with regard to Intermodal were, of course, done with the best interests of the railroad in mind, but the fact that these actions coincidentally promoted the interests of GECC is not evidence of an intentional inducement to breach a contract on GECC's part. Whether Mr. Wood believed that the railroad was breaching the contract one cannot know, although it is at least conceivable that the railroad was willing to risk a breach (and

damages) in order to be relieved of its obligations under the contract. But that is not evidence that GECC induced a breach.

## B.

Proving that GECC's conduct was improper is probably the most difficult of Intermodal's burdens in this case, not least because of the confusion that surrounds the term "improper." The Restatement goes on at some length about the care with which the term was chosen, and identifies and discusses various other descriptive words that were discarded along the way because they carried too much baggage (e.g., unreasonable, unfair, undue, unjust, and inequitable). At any rate, whether an inducement is improper, the Restatement tells us, depends on the weighing of a number of matters, namely, the nature of the actor's conduct, the actor's motive, the interests of the other with which the actor's conduct interferes, the interest sought to be advanced by the actor, the balance between the social interests in protecting the freedom of action of the actor and the contractual interest of the other, the proximity or remoteness of the actor's conduct to the interference, and the relations between the parties. See Restatement (Second) of Torts § 767 (1979). Iowa courts have faithfully rehearsed these considerations in dealing with cases like the one before us. See *Water Dev. Co. v. Bd. of Water Works*, 488 N.W.2d 158, 161-62 (Iowa 1992), and *Toney v. Casey's Gen. Stores, Inc.*, 460 N.W.2d 849, 853 (Iowa 1990). What is missing, as always with lists of this sort, is some formula by which to balance all of the relevant considerations.

We believe that the core of the tort of interference with contract can be found in cases in which the defendant lures the plaintiff's employee away, knowing that the employee has a contract with the plaintiff that he is breaking by going to work for the defendant. *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng. Rep. 749 (Q.B. 1853). Yet even this core has been controversial, since it

-7-

runs counter to the principle that a party breached against can be adequately compensated in damages for breach of contract. As to why a victim of a breach of contract should have a remedy in tort against a third party, various answers have been offered. One practical explanation is that a breaching servant is effectively judgment-proof. A desire to see that somebody pays undoubtedly serves to keep this tort alive today.

Liability has expanded beyond the predatory model most often, it seems, to cases in which the action taken is independently tortious. There are cases involving acts of violence, of fraud, and of defamation. A colorful illustration of the last is the case of *Am. Sur. Co. v. Schottenbauer*, 257 F.2d 6 (8th Cir. 1958), in which an employee brought an action against a workers' compensation insurer that had pressured the employer to terminate the employee's work contract. The insurer believed (mistakenly) that an illness the worker had contracted on the job was extremely serious and would require expensive treatment. The worker succeeded in his claim against the insurer for interference with an existing contract.

The case before us fits neither of these relatively clear categories since GECC is not a competitor of Intermodal and the alleged act of interference is not independently tortious. If we venture beyond these specific instantiations of the tort we encounter a great deal of ambiguity. The Restatement, in fact, notes that "[u]nlike other intentional torts such as intentional injury to person or property, or defamation, this branch of tort law has not developed a crystallized set of definite rules as to the existence or nonexistence of a privilege to act in the manner stated." Restatement (Second) of Torts § 767 comment b.

The Iowa courts, however, have provided us with some guidance, although the litigants debate strenuously the meaning of the

relevant case law.  In *Wilkin Elevator v. Bennett State Bank*, 522 N.W.2d 57, 62 (Iowa 1994), the court stated that "to establish improper interference a showing is required that the actor's predominant purpose was to injure or destroy the plaintiff's business."  Intermodal argues that this case was an anomaly, that it inexplicably abandoned the distinction that Iowa courts had long drawn between the tort of interference with an existing contract and the tort of interference with a prospective contract.  Only the latter tort, Intermodal argues, involves the higher burden, a burden that Intermodal concededly could not carry.  But the recent case of *Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996), decided after the district court entered judgment in this case, cited *Wilkin Elevator* approvingly in circumstances in which the plaintiff claimed an interference with an existing contract.  The court quoted approvingly the portion of *Wilkin Elevator* that had held that the plaintiff there had produced "no evidence of a predominant purpose of causing injury to the plaintiffs," and held that "a party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests."  Id.

These cases indicate to us that in Iowa the tort of interference with contract creates, in essence, a cause of action for unsavory predatory behavior ("predominant purpose to injure or destroy"), and thus the fact that a defendant was acting to protect his or her own financial interest is a legal datum relevant to determining whether he or she was justified in inducing a breach.  Intermodal maintains that GECC had no financial interest in the contract, but Intermodal itself created an extensive record at trial aimed at showing that GECC did indeed have such an interest in order to demonstrate that GECC had the motive to interfere with the contract.  In addition to the audit reports, memos, and minutes of meetings, there was the marginal note enjoining someone to "do this now."  We think that Intermodal had it right the first time --

that GECC had an interest in the contract, just as it had an interest in all aspects of the railroad, as one would expect of a primary creditor. The awkwardness of Intermodal's argument derives, we think, from the awkwardness of a tort that is not well defined.

We believe, for the reasons already stated, that the Supreme Court of Iowa would not find liability in a case like the instant one. We think, moreover, that it would find relevant the fifth of the considerations that the Restatement identifies as pertinent to cases like ours. The Restatement invites courts to balance the social interests in protecting a defendant's freedom of action against a plaintiff's contractual interest. GECC's conduct might well have benefited society, because, when one considers the secondary effects of a large bankruptcy, preventing CC&P from sliding into insolvency could well have produced a net social good. Intermodal's interests, moreover, were better served by having a solvent company with which to do business (or with which to litigate) than an insolvent one. Accordingly, we find that the evidence was insufficient to support an inference that GECC acted improperly under Iowa law.

### III.

We have considered Intermodal's complaints about certain evidentiary matters and detect no error in the trial court's rulings.

### IV.

For the reasons indicated, we reverse the district court's denial of judgment for GECC as a matter of law and remand the case to the district court with directions to enter judgment for GECC.

RICHARD S. ARNOLD, Chief Judge, concurs in the judgment and joins Part II. A. of the Court's opinion.

-10-

A true copy.

Attest:

　　　　CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.